IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

|  |  |  |
|---|---|---|
| ———————————————————— | ) | |
| Robert Moss, individually and as general guardian of his minor child; | ) ) ) | |
| Ellen Tillett, individually and as general guardian of her minor child; and | ) ) ) | |
| Freedom From Religion Foundation, Inc., a Wisconsin non-profit corporation, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 7:09-cv-1586-HMH |
| Spartanburg County School District No. 7, | ) ) ) | |
| Defendant. | ) ) | |
| ———————————————————— | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Eric C. Rassbach (*pro hac vice* pending)
Lori H. Windham (*pro hac vice* pending)
The Becket Fund for Religious Liberty
1350 Connecticut Ave., NW, Suite 605
Washington, DC 20036
erassbach@becketfund.org
lwindham@becketfund.org
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

Kenneth E. Darr, Jr. (Fed. I.D. #989)
Lyles, Darr, & Clark, LLP
104 N. Daniel Morgan Ave.
Suite 300
Spartanburg, South Carolina 29306
kdarr@ldclaw.com
Telephone: (864) 585-4806
Facsimile: (864) 585-4810

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION ........................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................. 2

STANDARD OF REVIEW ................................................................................. 7

ARGUMENT ................................................................................................... 8

    I.    Plaintiffs lack three of the four kinds of standing they claim. ................. 8

        A.    Plaintiffs' four kinds of standing ................................................. 8

        B.    Moss and Tillett do not have municipal taxpayer standing. ..................... 10

                1.    Moss and Tillett have suffered no injury. ....................................... 10

                        a.    None of Moss's and Tillett's money has been "extracted and spent" to pay for the SCBEST program. ........................................................................... 11

                        b.    Moss and Tillett cannot challenge time spent by the School District debating the measure. ................................ 14

                2.    Moss and Tillett also cannot show that any municipal taxpayer injury could be redressed by a decision in their favor. ........................................................................................ 14

        C.    Plaintiffs lack "offended observer" standing. ........................................... 15

                1.    A bare allegation of "offensive contact" is not a cognizable injury. ....................................................................................... 16

                2.    Offensive contact with the SCBEST program is not traceable to the School District. ...................................................... 18

                3.    Offensive contact, without more, is not redressable. ..................... 19

        D.    FFRF lacks organizational standing ........................................................... 20

                1.    FFRF cannot establish standing for itself. ..................................... 20

2.      FFRF cannot assert organizational standing on behalf of its members............................................................................21

II.     The released time policy does not violate the Establishment Clause. ................. 22

A.      The policy's purpose is to accommodate religion, not advance it............23

B.      The policy does not have the principal or primary effect of advancing religion..................................................................................25

1.      No public funds were used to advance religion. ...........................26

2.      Truancy enforcement is not advancement of religion under Zorach. .........................................................................................27

3.      Any advancement of religion is the result of the actions of SCBEST, and not attributable to Defendants. ..............................28

4.      The program does not endorse religion. ......................................29

C.      The program does not foster "excessive government entanglement with religion."..................................................................31

1.      The delegation of grading to the Oakwood school actually prevents entanglement. ................................................................31

2.      Provision of addresses avoids entanglement by ensuring no public funds flow to SCBEST......................................................32

3.      Plaintiffs' speculation that the School District might someday evaluate the content of SCBEST's programming—in contradiction of state statute—fails to state an Establishment Clause claim................................................................................33

CONCLUSION...................................................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Abington Township Sch. Dist.* v. *Schempp,*
    374 U.S. 203 (1963) ...................................................................................... 10

*Access 123, Inc.* v. *Markey's Lobster Pool, Inc.,*
    2001 WL 920051 (D.N.H. 2001)................................................................... 21

*Access 4 All, Inc.* v. *Trump Int'l Hotel and Tower,*
    458 F.Supp.2d 160 (S.D.N.Y. 2006) ............................................................ 21

*ACLU-NJ* v. *Township of Wall,*
    246 F.3d 258 (3d Cir. 2001) ........................................................................ 13

*Allen* v. *Wright,*
    468 U.S. 737 (1984) ...................................................................................... 9

*Altman* v. *Bedford Cent. Sch. Dist.,*
    245 F.3d 49 (2d Cir. 2001) .......................................................................... 12

*Americans United for Separation of Church and State* v. *Prison Fellowship Ministries,*
    509 F.3d 406 (8th Cir. 2007) ....................................................................... 15

*Bell Atlantic Corp.* v. *Twombly,*
    127 S.Ct. 1955 (2007)........................................................................ 8, 10, 31

*Bishop* v. *Bartlett,*
    2009 WL 2341984 (4th Cir., July 29, 2009) ....................................... 14, 18

*Brown* v. *Gilmore,*
    258 F.3d 265 (4th Cir. 2001) ......................................................... 23, 24, 33

*Capitol Square Review & Advisory Bd.* v. *Pinette,*
    515 U.S. 753 (1995) .................................................................................... 17

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints* v. *Amos,*
    483 U.S. 327 (1987) .................................................................................... 25

*DaimlerChrysler* v. *Cuno,*
    547 U.S. 332 (2006) ............................................................................. 10, 15

*Davis* v. *Federal Election Comm'n,*
    128 S.Ct. 2759 (2008)................................................................................. 10

*Disabled in Action of Metropolitan New York* v. *Trump Int'l Hotel & Tower,*
    2003 WL 1751785 (S.D.N.Y. 2003) ........................................................... 22

*Doe* v. *Duncanville Indep. Sch. Dist.*,
   70 F.3d 402  (5th Cir. 1995) ................................................................... 12

*Doe* v. *Madison School District No. 321*,
   177 F.3d 789 (9th Cir. 1999) ........................................................... 12, 13

*Doremus* v. *Bd. of Educ.*,
   342 U.S. 429 (1952) ................................................................... 11, 12, 14

*Ehlers-Renzi* v. *Connelly School of the Holy Child*,
   224 F.3d 283 (4th Cir. 2000) ..................................................................... 29

*Freedom From Religion Foundation, Inc.* v. *Zielke*,
   845 F.2d 1463 (7th Cir. 1988) ................................................................. 12

*Friedmann* v. *Sheldon Comm'y Sch. Dist.*,
   995 F.2d 802 (8th Cir.1993) .................................................................... 12

*Friends for Ferrell Parkway, LLC* v. *Stasko*,
   282 F.3d 315 (4th Cir. 2002) ................................................. 9, 10, 14, 18

*Friends of the Earth* v. *Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000) ................................................................................... 9

*Gonzales* v. *North Township of Lake County*,
   4 F.3d 1412 (7th Cir. 1993) ..................................................................... 12

*Gruntal & Co., Inc.* v. *Steinberg*,
   837 F.Supp. 85 (D.N.J. 1993) .................................................................. 20

*Havens Realty Corp.* v. *Coleman*,
   455 U.S. 363 (1982) ................................................................................. 21

*Hein* v. *Freedom From Religion Foundation*,
   551 U.S. 587 (2007) ................................................................................. 22

*Hunt* v. *Washington State Apple Advertising Comm'n*,
   432 U.S. 333 (1977) ................................................................................. 21

*Koenick* v. *Felton*,
   190 F.3d 259 (4th Cir. 1999) ............................................................ 10, 13

*Lambeth* v. *Board of Commissioners of Davidson County*,
   407 F.3d 266 (4th Cir. 2005) ...................................... 22, 23, 25, 30, 31

*Lanner* v. *Wimmer*,
   662 F.2d at 1359 (10th Cir. 1981) ............................... 26, 27, 28, 29, 32

*Laskowski* v. *Spellings*,
     546 F.3d 822 (7th Cir. 2008) ................................................................ 15

*Lemon* v. *Kurtzman*,
     403 U.S. 602 (1971) .................................................................... 22, 31

*Lujan* v. *Defenders of Wildlife*,
     504 U.S. 555 (1992) .................................................................... 19, 20

*Madison* v. *Riter*,
     355 F.3d 310 (4th Cir. 2003) ........................................................ 25, 26

*McCreary County* v. *ACLU of Kentucky*,
     545 U.S. 844 (2005) ............................................................................ 23

*Papasan* v. *Allain*,
     478 U.S. 265 (1986) ............................................................................ 10

*Peck* v. *Upshur County Bd. of Educ.*,
     155 F.3d 274 (4th Cir. 1998) .............................................................. 24

*Pierce ex rel. Pierce* v. *Sullivan W. Central Sch. Dist.*,
     379 F.3d 56 (2d Cir. 2004) .................................................... 18, 29, 30

*Robinson* v. *American Honda Motor Co.*,
     551 F.3d 218 (4th Cir. 2009) ................................................................ 8

*Salazar* v. *Buono*,
     No. 08-472 (cert. pet. granted Feb. 23, 2009) ...................................... 16

*Schneider* v. *Colegio de Abogados de Puerto Rico*,
     917 F.2d 620 (1st Cir. 1990) ................................................................ 12

*Smith* v. *Smith*,
     523 F.2d 121 (4th Cir. 1975) .................................... 2, 22, 23, 24, 25, 27, 28, 30, 32

*Stephens* v. *County of Albemarle*,
     524 F.3d 485 (4th Cir. 2008) ................................................................ 9

*Suhre* v. *Haywood County*,
     131 F.3d 1083 (4th Cir. 1997) ............................................................ 16

*United States ex rel. Vuyyuru* v. *Jadhav*,
     555 F.2d 337 (4th Cir. 2009) ................................................................ 7

*Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*,
     454 U.S. 464 (1982) ............................................................................ 16

*Walz* v. *Tax Commission of City of New York,*
   397 U.S. 664 (1970) ............................................................................... 25

*White Tail Park, Inc.* v. *Stroube,*
   413 F.3d 451 (4th Cir. 2005) ............................................... 6, 7, 20, 21

*Zelman* v. *Simmons-Harris,*
   536 U.S. 639 (2002) ............................................................................... 28

*Zorach* v. *Clauson,*
   343 U.S. 306 (1952) ........................................... 2, 23, 24, 27, 29, 30, 33

**Statutes**                                                                    **Page(s)**

2002 S.C. ACTS 241 ................................................................................. 2

2006 S.C. ACTS 322 ................................................................................. 2

S.C. CODE ANN. § 59-1-460 ........................................... 2, 26, 29, 33

S.C. CODE ANN. § 59-39-112 ................................................................. 3, 4

**Other Authorities**                                                           **Page(s)**

Minutes of Regular Meeting of the Board of Trustees of Spartanburg
   County School District No. 7 (Feb. 6, 2007) .................................... 4

Minutes of Regular Meeting of the Board of Trustees of Spartanburg
   County School District No. 7 (March  6, 2007) ................................. 4, 5

South Carolina Department of Education, Division of Standards and Learning, CREDIT
   RECOVERY: A GUIDANCE DOCUMENT FOR SERVICE DELIVERY 4 ................................. 3

South Carolina Department of Education, 2007 UNIFORM GRADING POLICY ................ 3

**Rules**                                                                       **Page(s)**

FED. R. CIV. P. 12(b)(1) ........................................................................ 7

FED. R. CIV. P. 12(b)(6) ........................................................................ 8

**Regulations**                                                                 **Page(s)**

S.C. CODE ANN. REGS. 43-234 .................................................................. 5

S.C. CODE ANN. REGS. 43-273 .................................................................. 4

## INTRODUCTION

This lawsuit is an indirect constitutional challenge to two South Carolina statutes enacted in 2002 and 2006.  The first, the South Carolina Released Time for Religious Education Act, is designed to accommodate the beliefs of religious students by allowing them to be released to private religious educational programs during the school day.  The second, the South Carolina Released Time Credit Act, allows students participating in released time programs to receive "Carnegie units"—credits toward graduation—for the instruction they receive as a part of an approved released time program.  The standards the State uses for recognizing credits obtained from the released time program are borrowed from the regulations governing the transfer of credits from out-of-state schools or private schools, religious or non-religious.

Plaintiffs—a Wisconsin-based advocacy group, the Freedom From Religion Foundation, and two Spartanburg parents—have chosen not to challenge the Released Time Acts directly. Instead, they seek a declaration that the released time policy of Spartanburg School District No. 7 violates the Establishment Clause.  However, because the School District's released time policy hews very closely to the language of the Released Time Acts, granting the Plaintiffs the relief they seek would effectively invalidate the Released Time Acts themselves, immediately suspending their operation across South Carolina.

Happily, the Court need not—indeed, cannot—take this drastic step.  First, Plaintiffs lack standing to bring most parts of their lawsuit, significantly narrowing its scope.  In particular, Plaintiff Freedom From Religion Foundation should be dismissed from the case altogether for lack of organizational standing.

Second, Plaintiffs' attack on the Released Time Acts fails because they have not stated an Establishment Clause claim that would allow the Court to grant them the relief they seek.

1

Longstanding Supreme Court and Fourth Circuit precedent make clear that released time programs—even those that result in some credit toward graduation from public school—are constitutionally unobjectionable.  The Court should dismiss the entire lawsuit on that basis.

## FACTUAL AND PROCEDURAL BACKGROUND

For a number of years, the state of South Carolina has permitted public high school students to be released from classes for a portion of the school day to attend religious instruction.[1]  *See* S.C. CODE ANN. § 59-1-460.  Such released time programs were implemented across the nation after the Supreme Court's decision in *Zorach* v. *Clauson,* 343 U.S. 306 (1952).[2]  In South Carolina alone, 6500 students at 71 public schools participate in released time programs each week.  Docket Entry No. 1, Complaint ("Cmplt.") at Ex. A.   South Carolina's original released time statute permitted students to have excused absences for religious instruction, meaning that their attendance at religious classes would not delay graduation or subject them to truancy enforcement.  *See* S.C. CODE ANN. § 59-1-460.

Although this 2002 law permitted released time programs, it did not confer on school districts the authority to confer credit hours (or "Carnegie units") on students participating in such programs.  Over time, the lack of credit hours eroded South Carolina's released time policy: "the absence of an ability to award such credits has essentially eliminated the school districts' ability to accommodate parents' and students' desires to participate in released time programs." Cmplt. ¶ 18; 2006 S.C. ACTS 322 (preamble to the 2006 Act).  For this reason, in 2006 the state legislature enacted the Released Time Credit Act, which permits "no more than two elective

---

[1]    The first law cited in the complaint was enacted in 2002. S.C. CODE ANN. § 59-1-460. The complaint also suggests that released time programs were active prior to 2002.  *See* Cmplt. at Ex. A (describing program active in 1998).

[2]    *See, e.g.,* 2002 S.C. ACTS 241 (preamble to 2002 Act); *Smith* v. *Smith,* 523 F.2d 121 (4th Cir. 1975).

Carnegie units for the completion of released time classes in religious instruction." Cmplt. ¶ 18; S.C. CODE ANN. § 59-39-112.

The criteria for awarding Carnegie units "are substantially the same criteria used to evaluate similar classes at established private high schools for the purpose of determining whether a student transferring to a public high school from a private high school will be awarded elective Carnegie units for such classes." *Id.* The statute also specifies that "classes in religious instruction are evaluated on the basis of purely secular criteria" and "not involve any test for, religious content or denominational affiliation." *Id.*

Students in South Carolina may choose from a variety of elective Carnegie unit options. Students may enroll in dual-credit courses with local universities, earning both Carnegie units and college credit.[3] Students may take International Baccalaureate (IB) or Advanced Placement (AP) classes, which may be offered as traditional courses or may be "offered online and in other nontraditional settings." *Id.* Failing students can also make up credits using software-driven courses "aligned with South Carolina's Academic Standards."[4] State regulations require that letter grades be assigned for all courses for which Carnegie units are granted.[5]

The South Carolina Released Time Credit Act mandates that school districts, in deciding how many Carnegie units to award to students who complete a released time course, use "substantially the same criteria" used to determine to what units to award a student transferring

---

[3]     SOUTH CAROLINA DEPARTMENT OF EDUCATION, 2007 UNIFORM GRADING POLICY ("Uniform Grading Policy") at 55-03-3 to 55-03-4 (2007), *available at* http://ed.sc.gov/agency/Standards-and-Learning/Instructional-Promising-Practices/old/hsr/documents/INEZ2006UGP_1ApprovedbySBE1-9-07.pdf.

[4]     South Carolina Department of Education, Division of Standards and Learning, CREDIT RECOVERY: A GUIDANCE DOCUMENT FOR SERVICE DELIVERY 4, *available at* http://ed.sc.gov/agency/Standards-and-Learning/.

[5]     Uniform Grading Policy at 55-03-6.

to a public high school from a private high school.  Cmplt. ¶ 18; S.C. CODE ANN. § 59-39-112. The rules governing how units will be credited to a student transferring into a South Carolina public high school are set forth at S.C. CODE ANN. REGS. 43-273.

After the state legislature passed the Released Time Credit Act, a representative of the Spartanburg County Bible Education in School Time[6] ("SCBEST") approached Defendant Spartanburg School District No. 7 ("School District") and expressed an interest in offering a released time class to students of Spartanburg High School, the only high school in the School District.  Cmplt. ¶ 20.  In the late 1990s, SCBEST offered classes to Spartanburg High School students, but had to discontinue the program because elective credit was not available for the course. *See* Cmplt. at Apx. A.

On January 9, 2007, a new released time policy modeled on S.C. CODE ANN. § 59-39-112 was proposed at a meeting of the Board of Trustees of the School District.  Cmplt. ¶ 21.  At a Board meeting on February 6, 2007, the proposed policy was read and approved for the first time, and at the March 7, 2007 Board meeting, the School District again read and officially passed the policy, entitled "Released Time for Religious Instruction" ("the Policy").[7]  The Released Time Policy sets forth the criteria under which the School District will permit students to attend off-campus religious instruction courses during normal school hours.  Cmplt. ¶ 23.  For

---

[6]    The Plaintiffs' Complaint incorrectly states that the "SC" in "SCBEST" stands for "South Carolina."  *Compare* Cmplt. ¶ 20 *and* Cmplt. at Ex. A.

[7]    See Cmplt. ¶ 21-23; *see also* Minutes of Regular Meeting of the Board of Trustees of Spartanburg County School District No. 7 (Feb. 6, 2007), and Minutes of Regular Meeting of the Board of Trustees of Spartanburg County School District No. 7 (March  6, 2007) ("March 6, 2007 Minutes"), *available at* http://www.spartanburg7.org/site_res_view_folder.aspx? id=a6220e76-3fab-432d-9617-429499bd539b.

classes that meet these criteria, students in the School District may earn up to two elective Carnegie unit credits.[8]  *See id.*

In or around March 2007, SCBEST sent out a letter stating it would offer religious instruction classes eligible for school credit starting in August 2007.  *See* Cmplt. at Ex. A. Plaintiffs allege SCBEST sent the letter to the addresses of rising 10th, 11th, and 12th grade students, and that it obtained the letter from the School District.  Cmplt. ¶ 9.  The letter directed parents and students to the SCBEST website and provided a registration card for interested families.  Cmplt. at Ex. A.    Among the individuals receiving the letter were Plaintiffs Robert Moss and Ellen Tillett.[9]  Cmplt. ¶ 9.

Plaintiff Robert Moss, whose child attends Spartanburg High School, drafted written remarks opposing the released time Policy, which were presented (apparently by Heidi Moss) at the March 6 School Board meeting.  Cmplt. ¶ 9; March 6, 2007 Minutes at 4.  Heidi Moss stated that the Policy was unconstitutional and that she was contacting the ACLU to file a lawsuit against the School District.  *See* March 6, 2007 Minutes at 4.  Because of these comments, Robert Moss alleges that he was "subjected to adverse public comment," but does not explain who made the adverse comments publicly or whether he actually attended the March 6, 2007 Board meeting.  Cmplt. ¶ 9; *see also* March 6, 2007 Minutes.  Moss also alleges that on either this or another occasion, he complained to the Chairman of the School District's Board of

---

[8]    Under regulations established by the South Carolina Department of Education, to qualify for a South Carolina high school diploma, a student must earn a total of 24 units of credit, or Carnegie units, in state-approved courses.  Seven of these required units may come from electives.  *See* http://ed.sc.gov/features/backtoschool/gradreq.html; S.C. CODE ANN. REGS. 43-234.

[9]    Plaintiffs do not allege when the letter was received.  The text of the letter suggests that may have been sent after the first reading and approval of the Policy.  *See* Ex. A ("The District 7 School Board recently granted SCBEST approval to being offering this class for elective credit.").

Trustees and its Acting Superintendent about the Released Time Policy; he alleges that they "summarily" dismissed his complaints.  Cmplt. ¶ 9.

The Policy was finally adopted at the March 6, 2007 Board meeting and, beginning in August 2007, SCBEST began offering released time classes for interested students.  Cmplt. ¶ 25. The number of students in the classes has been small—fourteen total over four semesters—and the program makes only minimal claims on the School District's administrative staff. Declaration of Thomas D. White, Jr. ("White Decl.") ¶¶ 3-4.[10]  The administrative time spent by School District staff on the released time program "has never amounted to more than five employee hours per school year."  White Decl. ¶ 4.  The released time courses SCBEST teaches are overseen by Oakbrook Preparatory School, an accredited private high school located in Spartanburg, South Carolina.  Cmplt. ¶ 35.  Oakbrook Preparatory School receives information regarding students' progress from SCBEST and at the conclusion of the semester submits the students' grades to the School District.  Cmplt. ¶ 35.

Plaintiffs—Moss, Tillett, and the Wisconsin-based advocacy organization Freedom From Religion Foundation ("FFRF") —filed this lawsuit in June 2009, seeking a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Defendant, Spartanburg County School District No. 7 ("School District") violated the First Amendment of the United States Constitution in implementing its Released Time for Religious Education Policy ("Released Time Policy"). Cmplt. ¶ 4.  Plaintiffs have not directly challenged the underlying South Carolina statutes cited in the Released Time for Religious Education Policy.  *See* Cmplt. ¶ 4, 39.  Plaintiffs do not say they are seeking damages, but do seek attorney's fees.  Cmplt. ¶ 39.

---

[10]    The Court may consider this evidence "outside the pleadings without converting the proceeding to one for summary judgment."  *White Tail Park, Inc.* v. *Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (quotation omitted).

Plaintiffs Moss and Tillett claim that they and their minor children have suffered various harms flowing from the School District's implementation of its Released Time Policy.  Cmplt. ¶¶ 6–13, 17–37.  They allege that they and their minor children have each been offended by and emotionally affected by the School District's implementation of the Released Time Policy. Cmplt. ¶ 9.  The Moss and Tillett allege that they and their minor children have come into "offensive contact" with the School District's implementation of the Released Time Policy. Cmplt. ¶ 10.  The Moss and Tillett also allege that they and each of their minor children have formed a belief that the School District's implementation of the Released Time Policy violates the Establishment Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Cmplt. ¶ 8.

FFRF alleges that 82 of its 13,700 members live in South Carolina, but does not allege that any of its members live within the boundaries of the School District, or in the city of Spartanburg.  Cmplt. ¶ 14.  FFRF also does not allege that any of its members pay taxes specifically to support Spartanburg County School District No. 7.  *See id.*

## STANDARD OF REVIEW

This Court must dismiss the lawsuit if it finds that it "lack[s] subject-matter jurisdiction" over Plaintiffs' claims.  FED. R. CIV. P. 12(b)(1).   "When, as here, a defendant challenges the existence of subject-matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence."  *United States ex rel. Vuyyuru* v. *Jadhav*, 555 F.2d 337, 347 (4th Cir. 2009).  In determining whether jurisdiction exists, the district court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *White Tail Park, Inc.* v. *Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (quotation omitted).

7

This Court must also dismiss Plaintiffs' claims if they "fail[] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When reviewing a 12(b)(6) motion, the district court "will construe factual allegations in the non-moving party's favor and will treat them as true, but the court is not bound by the complaint's legal conclusions." *Robinson* v. *American Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009) (citation omitted). To survive a Rule 12(b)(6) motion to dismiss, "the facts alleged 'must be enough to raise a right to relief above the speculative level' and must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp.* v. *Twombly,* 127 S.Ct. 1955, 1965 (2007)).

## ARGUMENT

This Court should address both Plaintiffs' standing and the merits of their claims. Since standing is a "threshold matter," the Court should address standing first. *Steel Co.* v. *Citizens for a Better Environment*, 523 U.S. 83, 94 (1998). Plaintiffs are unable to demonstrate three of the four forms of Establishment Clause standing they claim, and the complaint should therefore be dismissed to the extent it relies on any of those bases for standing.

Plaintiffs' allegations are also not enough to make out an Establishment Clause claim on the merits because they do not allege facts that would support improper purpose, the effect of advancing religion, or the entangling of church and state. Therefore the Court should dismiss the complaint in its entirety, with prejudice.

**I.      Plaintiffs lack three of the four kinds of standing they claim.**

**A.      Plaintiffs' four kinds of standing.**

Article III, Section 2 of the Constitution restricts the federal courts to addressing actual cases and controversies. "Among '[t]he several doctrines that have grown up to elaborate that requirement,' the one 'that requires a litigant to have 'standing' to invoke the power of a federal

court is perhaps the most important.'" *Friends for Ferrell Parkway, LLC* v. *Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (quoting *Allen* v. *Wright*, 468 U.S. 737, 750 (1984)).  In order to satisfy Article III standing requirements, "a plaintiff must show that (1) [she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Stephens* v. *County of Albemarle*, 524 F.3d 485, 491 (4th Cir. 2008) (quoting *Friends of the Earth* v. *Laidlaw Envtl. Servs.,* 528 U.S. 167, 180–81 (2000)).

In this case, it is unclear from the Complaint whether Plaintiffs have standing to bring this action, because Plaintiffs do not specifically allege any form of standing in the Complaint. Instead, they present certain facts that appear to be offered to support different forms of standing. Based on these facts, Plaintiffs appear to assert by implication four grounds of standing:

1.  Municipal taxpayer standing (for Plaintiffs Moss and Tillett) (Cmplt. ¶¶ 6, 13);

2.  "Offended observer" standing (for Plaintiffs Moss and Tillett) (Cmplt. ¶¶ 9, 10)

3.  "GPA standing" (for Plaintiffs Moss and Tillett) (Cmplt. ¶ 11)

4.  Organizational standing (for Plaintiff FFRF) (Cmplt. ¶ 14)

For purposes of this motion only, the School District concedes that there do not appear to be enough facts in the Complaint for the Court to determine at this stage of the lawsuit whether Moss and Tillett have "GPA standing," that is, standing to claim that their children have suffered from a loss in class rank due to the existence of SCBEST's program.  However, Plaintiffs clearly lack the three other forms of standing.  The Court should rule on whether Plaintiffs possess these other forms of standing before it reaches the merits, since that will both significantly narrow the issues remaining in the lawsuit as well as what remedies Plaintiffs might be entitled to.  *See*, *e.g.*,

*Davis* v. *Federal Election Comm'n*, 128 S.Ct. 2759, 2769 (2008) ("a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought") (internal quotation marks and citation omitted).

### B.    Moss and Tillett do not have municipal taxpayer standing.

Moss and Tillett fail to meet the most basic requirements of municipal taxpayer standing. Neither Moss nor Tillett alleges facts sufficient to establish an injury in fact, much less one which could be addressed through a favorable judicial decision.[11]

### 1.    *Moss and Tillett have suffered no injury.*

To establish an "injury-in-fact," Plaintiffs must demonstrate that they are "directly affected by the laws and practices against [which] their complaints are directed.'" *Koenick* v. *Felton*, 190 F.3d 259, 263 (4th Cir. 1999) (quoting *Abington Township Sch. Dist.* v. *Schempp*, 374 U.S. 203, 224 n.9 (1963)). Plaintiffs' alleged injuries must concern "the invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Ferrell Parkway*, 282 F.3d at 320.

In order to have municipal taxpayer standing, Plaintiffs must show "an alleged improper expenditure of municipal funds." *Koenick*, 190 F.3d at 263.   "[T]he 'injury' alleged in Establishment Clause challenges" is the "very 'extract [ion] and spen[ding]' of 'tax money' in aid of religion alleged by a plaintiff." *DaimlerChrysler* v. *Cuno,* 547 U.S. 332, 348 (2006).  But a bare allegation of improper spending is not enough.  The Supreme Court is clear that a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do…." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan* v. *Allain,* 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not

---

[11]    FFRF does not allege that it has paid taxes to the School District, and therefore does not claim municipal taxpayer standing on its own behalf. *See* Cmplt. ¶ 14.

bound to accept as true a legal conclusion couched as a factual allegation")).

Plaintiffs Moss and Tillett's only allegation regarding expenditures is that "Defendant has used measureable [sic] portions of its tax revenues to investigate and approve and implement the Policy." Cmplt. ¶ 13. This allegation is insufficient under *Twombly*, as it merely couches legal conclusions as fact. In addition, this allegation does not support standing because the Plaintiffs have not alleged an appropriation of tax dollars in support of the program, and Moss and Tillett cannot state a claim merely by challenging the amount of time spent by the School District debating the measure.

> a.    None of Moss's and Tillett's money has been "extracted and spent" to pay for the SCBEST program.

Moss and Tillett have no injury because they fail to allege an appropriation of tax dollars in support of the program. Their only allegation on this point—small amounts of administrative effort or resources—is not actionable under the Establishment Clause. This has been true since the Supreme Court first elucidated municipal taxpayer standing in *Doremus* v. *Bd. of Educ.*, 342 U.S. 429 (1952). There, the court rejected a state and municipal taxpayer challenge to Bible readings in public schools because "[t]here is no allegation that this activity is supported by any separate tax or paid for from any particular appropriation or that it adds any sum whatever to the cost of conducting the school." *Doremus,* 342 U.S. at 433. Here, plaintiffs failed to identify any appropriation in support of the program or point to any cost increases resulting from administration of the program.

A few minutes of time from an existing employee—even if those few minutes occur on a daily basis—is insufficient to create an injury for the purposes of municipal taxpayer standing. *See Doremus,* 342 U.S. at 430–31 (describing daily Bible readings). Moreover, as the Complaint affirms, the official policies of both the state of South Carolina and the School Board are to

ensure that no public funds are used to support the released-time program. *See* Cmplt. ¶ 17 ("no public funds are expended and no public school personnel are involved in providing the religious instruction") (quoting S.C. CODE ANN. § 59-1-460); Cmplt. ¶ 23 ("District officials [have] insure[d] that no public funds [have been] expended to support a released time program.") (quoting Policy). In fact, the total time spent administering the School District's Policy amounts to no more than a handful of hours per year of employee time. White Decl. ¶ 4. This is certainly far less than even the *de minimis* use of employee time in *Doremus,* which required a few moments of time from every teacher on a daily basis. *See Doremus,* 342 U.S. at 430–31. Thus the Complaint suggests, and the facts confirm, that any funds spent are *de minimis*.

This argument accords with the overwhelming weight of precedent on this point. Courts regularly apply *Doremus* to bar taxpayer suits where the plaintiffs cannot identify measurable appropriations in support of the allegedly unconstitutional policy.[12] For example, in *Doe* v. *Madison School District No. 321*, 177 F.3d 789 (9th Cir. 1999) (en banc), a unanimous Ninth Circuit rejected a taxpayer challenge to prayers at a graduation ceremony because the

---

[12]     *See, e.g., Altman* v. *Bedford Cent. Sch. Dist.*, 245 F.3d 49 (2d Cir. 2001) (holding municipal taxpayers cannot challenge school programs "simply because they are conducted 'by its paid employees,'… To confer taxpayer standing on such a basis would allow any municipal taxpayer to challenge virtually any governmental action at any time."); *Doe* v. *Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 408  (5th Cir. 1995) (rejecting municipal taxpayer challenge to Bible distribution because school did not purchase or distribute Bibles and no school space was "set aside for this sole purpose"); *Friedmann* v. *Sheldon Comm'y Sch. Dist.,* 995 F.2d 802, 803 (8th Cir.1993) (rejecting state taxpayer challenge to graduation prayer because plaintiffs "have not shown any state money going to the invocation or benediction, which is what they contend violates the Establishment Clause."); *Gonzales* v. *North Township of Lake County,* 4 F.3d 1412 (7th Cir. 1993) (rejecting municipal taxpayer challenge to religious display because no town funds were spent to purchase or maintain the display); *Schneider* v. *Colegio de Abogados de Puerto Rico,* 917 F.2d 620 (1st Cir. 1990) (rejecting taxpayer challenge to government regulation because no additional employees were hired to oversee the program and the program was run out of existing offices); *Freedom From Religion Foundation, Inc.* v. *Zielke,* 845 F.2d 1463 (7th Cir. 1988) (rejecting municipal taxpayer challenge to Ten Commandments display because no government money was spent on the display).

expenditures in question "are ordinary costs of graduation that the school would pay whether or not the ceremony included a prayer."[13] *Id.* at 794. The court explained that these expenses were like those in *Doremus*, where "the school's expenditures for teachers' salaries, equipment, building maintenance, and the like were insufficient to confer taxpayer standing despite their indirect support of the Bible reading." *Id.* at 794. Similarly, in *ACLU-NJ* v. *Township of Wall,* the Third Circuit rejected a municipal taxpayer challenge to religious holiday display because, even though the display was "set up with defendant's support, direction and/or approval," the employee time and town funds spent on the religious elements of the display were no "more than the de minimis expenditure that was involved in the Bible reading in *Doremus*." 246 F.3d 258, 263–64 (3d Cir. 2001) (Alito, J.). Minor expenditures of existing employee time and resources are not injuries under taxpayer standing doctrine.

By contrast, in *Koenick* v. *Felton,* a municipal taxpayer had standing because she could identify specific legislative expenditures—statutes mandating paid holidays surrounding Easter. 190 F.3d at 263–64. These measurable, statutorily-mandated expenditures—representing two full days of pay for all of the public school employees in the state—stand in sharp contrast to the minor claims on employee time in *Doremus*, *Madison*, *Duncanville*, and this case.

Plaintiffs have not alleged that the Policy led the School District to hire additional employees, rent additional space, make specific appropriations, or otherwise added any cost whatsoever to the existing expense of running the school. Nor can they point to any statute mandating expenditures by the School District. To the contrary, the laws in question prohibit extra expenditures in support of the released time program. Plaintiffs' vague allegation of

---

[13]     That is not to say such displays can never be challenged, merely that they cannot be challenged by someone solely because he or she pays taxes.

"measureable portions of its tax revenues [used] to investigate and approve and implement the Policy" is insufficient to allege an injury under *Doremus*.

> b.  Moss and Tillett cannot challenge time spent by the School District debating the measure.

Plaintiffs' next allegation does not lack for chutzpah.  Plaintiffs claim that they have standing based on the time the School District spent to "investigate and approve" the Policy.  Just as plaintiffs failed to identify any measurable expenditures associated with "implementing" the Policy, so too they fail to identify any appropriations used to investigate or approve the Policy.  The School District already employs administrators whose job it is to research and approve programming and transfer credits.  Plaintiffs fail to allege "a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of." *Doremus,* 342 U.S. at 434.

If this allegation were actionable, then every policy the School District "investigat[ed] and approve[d]" could give rise to a taxpayer claim for misuse of funds.  Such a broad rule would unquestionably "interpose the federal courts as 'virtually continuing monitors of the wisdom and soundness' of [school] fiscal administration," in violation of Supreme Court precedent.  *DaimlerChrysler,* 547 U.S. at 346 (quotation omitted).  The Court should reject this sweeping conception of municipal taxpayer standing.

> 2.  *Moss and Tillett also cannot show that any municipal taxpayer injury could be redressed by a decision in their favor.*

Under the redressability element of Article III standing, the plaintiff must demonstrate that it is "likely, and not merely speculative, that a favorable decision from the court will remedy the plaintiff's injury."  *Ferrell Parkway*, 292 F.3d at 320; *see also Bishop* v. *Bartlett*, —F.3d—, 2009 WL 2341984, at *4 (4th Cir., July 29, 2009).  However, Moss and Tillett are also unable to

demonstrate that a decision in their favor would address their injury. The proper form of redress for taxpayers is "an injunction against the spending" which violates the Establishment Clause. *See DaimlerChrysler,* 547 U.S. at 348–49. But because they have identified no expenditures, much less any continuing or planned expenditures, there is nothing to enjoin.

Similarly, Plaintiffs are not entitled to restitution for any expenditures that occurred in the past. Even when taxpayers have standing in Establishment Clause cases, "this standing extends only to suits to enjoin the violation." *Laskowski* v. *Spellings*, 546 F.3d 822 (7th Cir. 2008); *see also Americans United for Separation of Church and State* v. *Prison Fellowship Ministries,* 509 F.3d 406, 428 (8th Cir. 2007) (finding that the lower court "abused its discretion in granting recoupment for services rendered" by a religious prison ministry to state prisons). Restitution is therefore unavailable to Moss and Tillett because they are Establishment Clause plaintiffs and seek a private remedy from a public institution.

Because Plaintiffs cannot get restitution, they can seek only injunctive and declaratory relief. But they failed to identify any continuing or planned expenditures by the School District. *See* Cmplt. ¶ 13 (alleging only past expenditures). The Court has no expenditures to enjoin. Nor can it issue a declaratory judgment on the propriety of past expenses, since that would do nothing to redress Plaintiffs' claims for improper past expenditures. For this reason, Plaintiffs' claims cannot be redressed by a favorable decision.

### C.    Plaintiffs lack "offended observer" standing.

Plaintiffs Moss and Tillett also claim standing based on their "offensive contact" with the School District released time policy. The alleged "offensive contact" does not satisfy the elements of Article III standing.

1.     *A bare allegation of "offensive contact" is not a cognizable injury.*

As noted above, it is the plaintiff's burden to establish that he or she has suffered a concrete personal injury.  This same standard applies to plaintiffs alleging violations of the Establishment Clause: "there is of course no 'sliding scale' of standing."  *Suhre* v. *Haywood County*, 131 F.3d 1083, 1085 (4th Cir. 1997) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 484 (1982)) (citation omitted).  A plaintiff must allege more than mere "psychological harm."  *Valley Forge*, 454 U.S. at 484 .  For example, a plaintiff in religious display case must still demonstrate "unwelcome direct contact with a religious display that appears to be endorsed by the state."  *Suhre*, 131 F.3d at 1085.[14]

In their Complaint, Plaintiffs allege that each parent plaintiff and each minor child has come into "offensive contact" with the School District's implementation of the policy, but they are entirely vague as to what that offensive contact actually is.  Cmplt. ¶ 9.  Is the "offensive contact" Plaintiffs' mere knowledge that the Policy has been enacted?  The receipt of the letter from SCBEST?  The allegation that Moss received "adverse public comment"?  Or the allegation that School District officials "summarily" responded to his complaints about the SCBEST program?

Plaintiffs' mere knowledge that the Policy has been enacted cannot be enough to count as "unwelcome direct contact with a religious display" under *Suhre*.  By that standard, every person in the United States with any knowledge of the School District's Released Time Policy could sue

---

[14]     Moreover, the continued existence of offended observer standing is somewhat in doubt. The Supreme Court has granted certiorari in an offended observer standing case appealed from the Ninth Circuit, and will hear argument in the fall.  *See Salazar* v. *Buono*, No. 08-472, Questions Presented *available at* http://origin.www.supremecourtus.gov/qp/08-00472qp.pdf. The School District would be happy to provide further briefing on this point should it be helpful to the Court.

the School District, wherever they happened to read about it in the paper or on the Internet. The Court is not required to reach this absurd result.

If the "offensive contact" is the letter SCBEST sent, there is no injury-in-fact. First, no reasonable observer could confuse this letter for a religious display that was endorsed by the School District. *Cf. Capitol Square Review & Advisory Bd.* v. *Pinette*, 515 U.S. 753, 779–80, (1995) (O'Connor, J., concurring in part and concurring in judgment) ("[T]he reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious [speech takes place].") This is plain even if the reasonable observer understands no more than what the Plaintiffs' Complaint sets forth: the SCBEST sent out its letter *before* the School District granted it permission to teach a course, under a policy the School District had not yet enacted. Cmplt. ¶ 9. Moreover, SCBEST is not a state actor, so its actions cannot give rise to liability. The School District's only involvement, allegedly providing an address list to SCBEST, is not enough to create "unwelcome direct contact."

Moss also alleges that he was "subjected to adverse public comment" in response to his written remarks, and that the Chairman of the Board of Trustees and Acting Superintendent "summarily dismissed his concerns and objections" to the Released Time Policy. Cmplt. ¶ 9. These incidents, even if true, do not constitute cognizable injury. Comments from the public, however discourteous, cannot violate the Establishment Clause because they do not constitute state action. *See Habecker* v. *Town of Estes Park*, 518 F.3d 1217, 1225 (10th Cir. 2008) (FFRF case rejecting claim of Establishment Clause violation because "the independent action of some third party not before the court—rather than that of the defendant—was the direct cause of the plaintiff's harm.") (quotation omitted); *Pierce ex rel. Pierce* v. *Sullivan W. Central Sch. Dist.*,

379 F.3d 56, 60 (2d Cir. 2004)  (rejecting claim based upon hurtful statements where "it was the students, not the School District, who said and did [the] hurtful things.").

Nor do School District officials violate the Establishment Clause by failing to respond to Plaintiff' Moss's complaints in the way he would like them to.  *See Whitener* v. *McWatters*, 112 F.3d 740, 742 (4th Cir. 1997) ("if legislators of any political subdivision of a state function in a legislative capacity, they are absolutely immune from being sued under the provisions of § 1983.") (quotation omitted); *Collinson* v. *Gott*, 895 F.2d 994, 997 (4th Cir. 1990) (president of board of county commissioners enjoyed official immunity against claim that citizen's First Amendment rights were violated when president ruled him out of order at public meeting).

In sum, Plaintiffs' allegations do not plausibly describe the invasion of any legally protected interest.  Accordingly, the Plaintiffs' alleged "offensive contact" is not an injury-in-fact and the Court therefore lacks subject matter jurisdiction over these allegations.

> 2.  *Offensive contact with the SCBEST program is not traceable to the School District.*

Even assuming that the plaintiffs' allegations of "offensive contact" describe a concrete and non-speculative injury, plaintiffs have no standing because the contact they describe was with third parties not before the court, either unnamed citizens at a school board meeting, or SCBEST.

The traceability requirement "ensures that it is likely the plaintiff's injury was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court."  *Ferrell Parkway*, 282 F.3d at 320; *see also Bishop*, 2009 WL 2341984, at *4. "[W]hen a plaintiff is not the direct subject of government action, but rather when the 'asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*,' satisfying standing requirements will be 'substantially more difficult.'"  *Frank*

*Krasner Enters., Ltd.* v. *Montgomery County,* 401 F.3d 230, 234–35 (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 562 (1992)  (emphasis in original)).  This is so because "[t]he existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *Krasner* at 235 (quoting *Lujan*, 504 U.S. at 562 (emphasis in original) (citation omitted)).

Of the "offensive contact" outlined in Paragraph 9 of the Complaint, the only government action described is the alleged failure of two officials to respond to Plaintiff Moss' concerns and objections in the way he preferred.  Cmplt. ¶ 9.  The Complaint does not allege that those who directed "adverse public comments" toward Plaintiff Moss were state actors.  Cmplt. ¶ 9.  Nor is the government responsible for the content of the letter that Plaintiff Moss and Plaintiff Tillett received from a third party, SCBEST.  SCBEST sent the letters out without the School District's review or approval; indeed, the School District had not yet even approved SCBEST's proposal to teach a course the following school year.  Cmplt. ¶ 9.  In sum, the Plaintiffs' "offensive contact" with the released time program is not traceable to the School District, but to third parties not before the Court.

### 3.    *Offensive contact, without more, is not redressable.*

Finally, even if the "offensive contact" alleged by the plaintiffs constitutes an injury-in-fact, it is not at all clear that this injury would be redressed were the court to ultimately rule against the School District.

As noted above, the redressability inquiry concerns whether a favorable decision from the court will remedy the plaintiff's injury.  Accordingly, when a plaintiff "is not the direct subject of government action, but rather when the 'asserted injury arises from the government's

allegedly unlawful regulation (or lack of regulation) of *someone else*,' satisfying standing requirements will be 'substantially more difficult.'" *Krasner* at 234-35 (quoting *Lujan*, 504 U.S. at 562 (emphasis in original)).  As described above, the Plaintiffs' "offensive contact" allegations describe actions taken by third parties not before this Court.  Because the contact the Plaintiffs complain of is not attributable to the School District, a judgment declaring its implementation of its released time policy unconstitutional would not remedy these allegations.

Moreover, Plaintiffs allege no ongoing "offensive contact," or any prospective "offensive contact" in the future.  Since they are not entitled to a declaration that completed past School District actions violated the law, declaratory relief is unavailable and the offended observer claim is not redressable.  *See*, *e.g.*, *Gruntal & Co., Inc.* v. *Steinberg*, 837 F.Supp. 85, 89 (D.N.J. 1993) ("A declaratory judgment is inappropriate solely to adjudicate past conduct.") (citation omitted).

### D.    FFRF lacks organizational standing.

Organization plaintiffs, too, must demonstrate an injury-in-fact to have standing.  To do so, an organization must either identify injuries to itself, or show that it has standing to bring suit on behalf of its members.  The meager facts alleged by FFRF, the putative organizational plaintiff in this suit, are insufficient to establish either standing for itself as an organization or associational standing on behalf of its members.

#### 1.    *FFRF cannot establish standing for itself.*

FFRF cannot sue on its own behalf because it has not identified any injury to itself.  An organization can sue in its own right only if it suffers some distinct injury, such as the denial of the right to express its views in a public forum.  *See White Tail Park*, 413 F.3d 451 (4th Cir. 2005).[15] The injury must be "far more than simply a setback to the organization's abstract social

---

[15]    Plaintiffs plainly have had the opportunity to express themselves, since the Complaint alleges that Moss and Tillett were able to raise their objections at a School Board meeting.

interests." *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 379 (1982).  But FFRF alleges *only* a setback to its abstract social interests.  When describing its interest in the case, FFRF states that it advocates for separation of church and state, educates others about nontheists, and has members in South Carolina who share those goals.  Cmplt. ¶ 14.  While FFRF undoubtedly has a keen interest in the Spartanburg program, it has failed to allege anything more than a philosophical disagreement with the Defendants.  This kind of "abstract social interest[]" cannot support standing.

### 2.    *FFRF cannot assert organizational standing on behalf of its members.*

Nor can FFRF assert organizational standing on behalf of its members.  In order to establish this type of standing (sometimes called associational standing), an organization must demonstrate three things: "(1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit." *White Tail Park* v. *Stroube*, 413 F.3d at 458 (citation omitted).    FFRF has not alleged facts sufficient to support standing for any of its individual members.

In order to meet the first prong, the organization must show it has "members [who] would otherwise have standing to sue." *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  Plaintiffs Moss and Tillett do not allege they are members of FFRF, so none of their standing arguments apply to FFRF.[16]  Instead, FFRF states that it has 82 members in South

---

Cmplt. ¶ 9.

[16]    Even if Moss and Tillett were members, their membership would not be sufficient for FFRF to establish standing.  Associational standing is unnecessary and redundant if all the members with standing are already parties.  *See, e.g.*, *Access 4 All, Inc.* v. *Trump Int'l Hotel and Tower*, 458 F.Supp.2d 160, 173-75 (S.D.N.Y. 2006) (dismissing organizational plaintiff because its claims were identical to named member plaintiff's claims) (citing *Access 123, Inc.* v. *Markey's Lobster Pool, Inc.*, 2001 WL 920051 at *4 (D.N.H. 2001); *Disabled in Action of Metropolitan New York* v. *Trump Int'l Hotel & Tower*, 2003 WL 1751785, at *10 (S.D.N.Y.

Carolina who are "opposed to government endorsement of religion and violations of the Establishment of [sic] the First Amendment." Cmplt. ¶ 14. But mere opposition to policies is insufficient to confer standing. *See, e.g., Hein* v. *Freedom From Religion Foundation,* 551 U.S. 587 (2007). FFRF does not allege that its members are taxpayers—much less taxpayers to the Spartanburg School District—and it does not allege that any of its members have children in the Spartanburg School District. *See, generally,* Cmplt. None of its members has identified an injury-in-fact, the most basic requirement for standing. *See supra* Section I.B-C. Therefore FFRF cannot assert associational standing on their behalf, and it does not have organizational standing.

## II. The released time policy does not violate the Establishment Clause.

Plaintiffs' Establishment Clause claim, if successful, would have the effect of invalidating the Release Time Credit Act, because the language of the Policy is based so closely on the Act's language. However, controlling Fourth Circuit precedent forecloses Plaintiffs' Establishment Clause claim on the merits. Under *Lambeth* v. *Board of Commissioners of Davidson County*, 407 F.3d 266 (4th Cir. 2005), the Court must examine (1) "whether there was a secular purpose behind the [policy]"; (2) "whether the [policy]'s principal or primary effect was one that neither advanced nor inhibited religion"; and (3) "whether the [Policy] fostered an 'excessive government entanglement with religion.'" *Id.* at 269 (quoting *Lemon* v. *Kurtzman*, 403 U.S. 602, 612-13 (1971)). As part of the "effect" analysis, the Court must also decide whether the government's action "had the effect of 'endorsing' religion." *Id.* (citation omitted). The Fourth Circuit has made clear that released time programs normally do not run afoul of this test. *See Smith* v. *Smith,* 523 F.2d 121 (1975) (applying *Zorach* and *Lemon* to uphold released time program). The released time program challenged here is no different—it has a secular purpose, does not advance religion, and does not entangle church and state.

2003)).

### A.    The policy's purpose is to accommodate religion, not advance it.

Plaintiffs fail to allege facts supporting their claim that there is an improper religious purpose for the Released Time Policy.  Instead, they claim only that, prior to approving the Released Time Policy, the Board knew that SCBEST had requested to provide a released time program, and that the SCBEST program was evangelical Christian in nature.  *See* Cmplt., ¶¶ 20, 24 (alleging Board knew SCBEST was an evangelical Christian program prior to approving the policy).

But the governing Fourth Circuit test makes clear that the religious purpose of a third-party released time provider is not relevant to the purpose analysis—the plaintiff must allege and prove that the *government itself* had an improper purpose.  A government fails the purpose element of the Establishment Clause test only if it "acts with the ***ostensible*** and ***predominant*** purpose of advancing religion."  *McCreary County* v. *ACLU of Kentucky*, 545 U.S. 844, 860 (2005) (emphasis added).  By contrast, "the demonstration of … a legitimate secular purpose is 'a fairly low hurdle.'"  *Lambeth*, 407 F.3d at 270.  Moreover, "in assessing a statute's purpose," the Court acts "with appropriate deference to the legislature."  *Brown* v. *Gilmore*, 258 F.3d 265 (4th Cir. 2001).

Plaintiffs' emphasis on the content of SCBEST's program is misplaced.  First, both *Zorach* and *Smith* are devoid of any discussion of the nature of religious instruction carried out under their respective released time programs.  The focus in both cases is on the policy permitting the program.  *See Zorach,* 343 U.S. at 308–10 (factual recitation focusing solely on actions of the school district); *Smith,* 523 F.2d at 122–23 (same).  The content of religious instruction is thus irrelevant to the Establishment Clause analysis.

Second, the Fourth Circuit is clear that the motivations of third parties are not sufficient

to demonstrate a violation of the purpose prong of the *Lemon* test. "We do not impute an impermissible purpose to advance religion to an elected official merely because he responds to a religiously motivated constituent request," particularly absent "*any evidence that would suggest that any Board member's vote was religiously motivated*." *Peck* v. *Upshur County Bd. of Educ.*, 155 F.3d 274 (4th Cir. 1998) (emphasis in original). Plaintiffs have not alleged a predominantly religious purpose on the part the School Board itself, and an allegation of religious purpose by SCBEST cannot suffice. Plaintiffs failed to properly allege any violation of *Lemon's* purpose prong.

What then was the Board's purpose in approving the Released Time Policy? The only ostensible purpose of the Released Time Policy, as with the two South Carolina statutes it is based on, is the accommodation of religion. "[T]he *accommodation* of religion is itself a secular purpose in that it fosters the liberties secured by the Constitution." *Brown,* 258 F.3d at 276 (emphasis original). It has been long accepted that released time programs have a legitimate secular purpose if they "accommodate the wishes of the students' parents." *Smith* v. *Smith*, 523 F.2d 121 (4th Cir. 1975); *see also Zorach,* 343 U.S. at 313-14 ("When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs.").

This secular purpose is clear from the face of the Released Time Policy. The Policy states that its purpose is to create a "basic structure for released time for students for religious instruction"; it specifies that the instruction occurs only "at the written request of [the student's] parent/legal guardian"; and it ensures that "no public funds will be expended" on the released time program. Cmplt. ¶ 23 (quoting Policy). The Released Time Policy cross-references (and

was enacted to conform to) existing state law, which has the express purpose of creating "a constitutionally acceptable method" of awarding credit for released time classes "because the absence of an ability to award such credits has essentially eliminated the school districts' ability to accommodate parents' and students' desires to participate in released time programs." Cmplt. ¶ 18(5); 2006 S.C. ACTS 322. The text of both the Policy and the underlying state law demonstrates a legitimate secular purpose of accommodating parents who request religious instruction. "The purpose of the [] release-time program, like the *Zorach* program, is secular" because Spartanburg, like the school district in *Smith,* "aim[s] only to accommodate the wishes of the students' parents." *Smith,* 523 F.2d at 124.

**B.    The policy does not have the principal or primary effect of advancing religion.**

Plaintiffs allege no facts suggesting that the Policy has the principal or primary effect of advancing religion. "For a law to have forbidden 'effects' under *Lemon,* it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Madison* v. *Riter,* 355 F.3d 310, 318 (4th Cir. 2003) (quoting *Corporation of Presiding Bishop* v. *Amos,* 483 U.S. at 337 (1987)) (emphasis in original). Evidence of impermissible advancement "includes 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Id.* (quoting *Walz* v. *Tax Commission of City of New York,* 397 U.S. at 668 (1970)). Accepting all of Plaintiffs' allegations as true, the School District has not advanced religion: it does not sponsor religious instruction, it does not provide financial support to religion, and it is not actively involved in religious classes. Nor would anything alleged in the complaint indicate that "an informed, reasonable observer would view the [Policy] as an endorsement of religion." *Lambeth,* 407 F.3d at 272. The facts alleged in the complaint are thus incapable of supporting the claim that *the School District itself* advanced religion.

### 1.     *No public funds were used to advance religion.*

No advancement of religion occurred because there was no official sponsorship or funding of SCBEST classes.  Evidence of improper advancement includes "sponsorship" or "financial support" of "religious activity."  *Madison,* 355 F.3d at 318.  But Plaintiffs nowhere allege that public funds flowed to SCBEST.  *See, generally,* Cmplt.  Nor could they—both the Policy and the two state Released Time Acts make clear that public schools may not teach the religious courses themselves, and that the School District is not to expend funds on the program.[17]  Any "sponsorship" or "financial support" could come only in the form of indirect expenditures in support of the program.

But Plaintiffs fail to allege even indirect expenditures.  They claim the School District "used measureable portions of its tax revenues to … implement the Policy."  Cmplt. ¶ 13.  But they fail to identify just what these expenditures might be.  *See supra* Section I.B.  Routine administrative costs associated with implementing a released time program are not aid in advancement of religion.  The Tenth Circuit held that the "registration and recordkeeping" inherent in a released time program were not constitutionally problematic, nor were basic credit-granting procedures, because "[s]uch inquiry is analogous to the state's constitutional perusal of full-time private schools." *Lanner* v. *Wimmer,* 662 F.2d at 1359, 1361 (10th Cir. 1981).[18]  And *Smith* held that even if this sort of activity could be considered aid to religion, it was a minor—

---

[17]     *See* Cmplt. ¶ 17 ("no public funds are expended and no public school personnel are involved in providing the religious instruction.") (quoting S.C. CODE ANN. § 59-1-460); Cmplt. ¶ 23 ("District officials will insure that no public funds are expended to support a released time program.") (quoting Policy).

[18]     The *Lanner* court did find two portions of the Utah program problematic: the fact that the school sent someone to pick up admissions records from the released time program, and school officials' investigation into the "denominational" nature of the courses.  *Id.* at 1361-62.  The court permitted the programs to continue operating and to grant credit so long as these practices were ended.  *Id.* at 1363.

not principal or primary—effect of the program. *Smith,* 523 F.2d at 125. Small amounts of administrative time spent to implement a released time program are not sponsorship or financial support which advances religion.

If implementation of a released time program is not aid to religion, then surely the act of "investigat[ing]" and "approv[ing]" such a program cannot be. Cmplt. ¶ 13. In fact, some investigation and planning is important to ensure that such programs follow the Establishment Clause. *Cf. Lanner* v. *Wimmer,* 662 F.2d 1349 (10th Cir. 1981) (investigating multiple aspects of program administration in-depth to ensure the program did not violate the Establishment Clause). Thus the claim that the School District "used measureable portions of its tax revenues to investigate and approve...the Policy," Cmplt. ¶ 13, does not demonstrate aid to religion.

2.    *Truancy enforcement is not advancement of religion under Zorach.*

Plaintiffs allege that Defendants give aid to SCBEST because they threaten to enforce truancy laws against SCBEST students. Cmplt. ¶ 12. Plaintiffs do not give the details of these threats, nor do they allege that such enforcement has actually occurred. *See id.* But even if they had, under *Zorach* this sort of allegation cannot support a claim that religion is being advanced. *Zorach*'s reasoning permits the use of truancy laws for released time classes. The *Zorach* school required reports of students who missed released time classes, although it had not punished students for missing those classes. 343 U.S. at 308, 311 n.6. In fact, *Zorach* goes so far as to suggest that truancy laws could be used to punish students who missed religious worship:

> A catholic student applies to his teacher for permission to leave the school during hours on a Holy Day of Obligation to attend a mass. A Jewish student asks his teacher for permission to be excused for Yom Kippur. A Protestant wants the afternoon off for a family baptismal ceremony. In each case the teacher requires parental consent in writing. In each case the teacher, in order to make sure the student is not a truant, goes further and requires a report from the priest, the rabbi, or the minister.

*Zorach,* 343 U.S. at 313. Attendance reporting is a normal feature of released time programs.

27

*See Lanner,* 662 F.2d at 1355 (school kept records of released time attendance and reported repeat absences to parents).  Truancy enforcement for students who cut classes—even if they cut classes by abusing a released time system—is not impermissible aid under the Establishment Clause.  It is a long-accepted method for accommodating religious exercise while ensuring that the program is not abused.

> 3.    *Any advancement of religion is the result of the actions of SCBEST, and not attributable to Defendants.*

Plaintiffs also fail to state a claim because any advancement of religion which may occur is attributable to the actions of SCBEST, not the School District.  As the Fourth Circuit has made clear, the primary purpose of released time programs is the accommodation of the requests of parents: "public school cooperation with the religious authorities in *Zorach* and the instant case is a largely passive and administratively wise response to a plenitude of parental assertions of the right to 'direct the upbringing and education of children under their control.'" *Smith,* 523 F.2d at 125.  Any religious advancement is not attributable to the School District, but to the choices of parents, students, and the teachers in SCBEST.

Plaintiffs claim injury due to alleged grading advantages given to students in SCBEST. Cmplt. ¶ 11.  Even if this highly speculative allegation were to be credited, it would not constitute a valid claim against the School District.  Any differences in grading are due to the actions of SCBEST.  Plaintiffs have not alleged that the School District has any control over the grading of the course—in fact, they complain about the lack of oversight of the course.  *See* Cmplt. ¶¶ 26, 27, 35, 36.  The situation here is akin to that in school choice cases, where the "incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government…." *Zelman* v. *Simmons-Harris*, 536 U.S. 639, 652 (2002).  A grading benefit—if any occurred—would be

attributable to the free choices of students, parents, and SCBEST, not the School District.

The same is true for the content of religious programming. Plaintiffs describe the content of the program at some length, and allege the School District acted improperly because it knew of this content. Cmplt. ¶¶ 24-25. But they never allege that the School District has any control over program content; to the contrary, the Complaint clearly states that the School District may not teach the classes itself. *See* Cmplt. ¶ 17; S.C. CODE ANN. § 59-1-460. Nothing in *Zorach* or *Smith* suggests that school districts are responsible for the content of released time teaching.[19] *See supra* Section II.A. Courts have upheld programs which focused primarily on the Bible, *Lanner,* 662 F.2d at 1355; which were conducted at seminaries, *id.* at 1354–55; or which were frankly evangelical in nature. *See Pierce*, 379 F.3d at 58 (noting Protestant classes were provided by Child Evangelism Fellowship).[20] As *Zorach* explained, the school district is no more responsible for the content of released time classes than it is for the content of religious ceremonies for which students receive excused absences. *See Zorach,* 343 U.S. at 683 (likening released time classes to absences for Yom Kippur or baptismal rites).[21] Any advancement of religion in a released time program is attributed to the providers of religious instruction, not the public schools.

> 4. *The program does not endorse religion.*

---

[19]    In fact, attempts to monitor the religious content of released time classes may themselves violate the Establishment Clause. *See Lanner,* 662 F.2d at 1360-62 (holding that school officials may not base released time credit determinations on the "denominational" nature of the classes).

[20]    *Pierce* is also relevant to Moss' claim he was "subjected to adverse public comment" due to his opposition to the released time program. Cmplt. ¶ 9. *Pierce* held that similar comments were not relevant for Establishment Clause purposes because they were made by students, not the school district. 369 F.3d at 58, 60.

[21]    *See also Ehlers-Renzi* v. *Connelly School of the Holy Child,* 224 F.3d 283, 291 (4th Cir. 2000) (finding effect prong satisfied because "An exemption's effect of simply allowing a religious school to 'better ... advance [its] purposes' does not rise to a constitutionally prohibited magnitude.") (alterations in original).

Finally, Plaintiffs fail to state a claim that the School District's adoption of the policy advances religion because they fail to allege any endorsement of religion. The question is "whether an informed, reasonable observer would view the [Policy] as an endorsement of religion." *Lambeth,* 407 F.3d at 272. The reasonable observer will see no endorsement because released time programs, when conducted properly, do not endorse religion. *See Pierce,* 379 F.3d at 58, 60–61 (rejecting claim of religious endorsement where case was similar to *Zorach*). As *Zorach* and *Smith* explain, released time programs are simply an accommodation of the rights of parents, not an imposition of the will of the School District. *See Zorach,* 343 U.S. at 683 (comparing released time programs to excused absences for religious holidays); *Smith,* 523 F.2d at 123–24 (holding programs are permissible when "the schools only adjust[] 'their schedules to accommodate the religious needs of the people'") (quotation omitted). Here, the School District has installed safeguards to ensure that no endorsement takes place. It forbids school staff from promoting the released time program. Cmplt. ¶ 23 (quoting Released Time Policy). It prohibits any released time teaching on school property. *Id.* State law prohibits the classes from being taught by school staff or supported with public funds. Cmplt. ¶ 17. Although SCBEST first approached the School Board about the program, the resulting Policy was a neutral one which is not limited to any one released time program and permits any faith group to participate upon request. Cmplt. ¶¶ 20-23.

The reasonable observer would also be aware that the Policy (like the Released Time Acts) places released time classes on the same footing as existing private school classes and secular electives. The reasonable observer is aware of the existing laws, elective options, and historical background of the Policy. *See Lambeth,* 407 F.3d at 271-72. The relevant state law is clear that released time classes should be evaluated and credit granted on the same basis as that

given to private school transfer classes.  *See* Cmplt. ¶ 18.  Released time credits are offered as elective credits only, simply adding one more option to the menu of choices available as student electives.  *See* Cmplt. ¶ 23.  The reasonable observer, aware of the existing laws and elective options, would see that the Policy gives students and parents one more choice among existing educational options.  Taking all these facts and the historical background together, the reasonable observer could only conclude that the School District was acting to accommodate the religious beliefs and educational choices of students and parents, not to endorse religious belief.

### C. The program does not foster "excessive government entanglement with religion."

Plaintiffs also fail to state a claim that the Policy excessively entangles the School District with religion.  To the contrary, the Complaint demonstrates that the School District has put safeguards in place to prevent excessive entanglement.  Excessive entanglement is defined as the "'comprehensive, discriminating, and continuing state surveillance' of religious exercise." *Lambeth,* 407 F.3d at 273 (quoting *Lemon,* 403 U.S. at 619).  Nothing like that level of involvement is alleged here.  The School District's delegation of accreditation to a private school allows the School District to avoid entanglement, as does the release of parents' contact information to SCBEST.  Plaintiffs' entanglement allegations amount to no more than fears about what *might* happen.  They "have not nudged their claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570.

### 1. The delegation of grading to the Oakwood school actually prevents entanglement.

Plaintiffs object to SCBEST's arrangement with Oakwood Preparatory School, which allows SCBEST grades to be treated like Oakwood grades for transfer purposes.  Cmplt. ¶¶ 31, 35.  This arrangement is not evidence of excessive entanglement, but of proper steps taken to

31

prevent entanglement. Under South Carolina law, classes from released time programs are treated identically to transfer classes from private schools. Cmplt. ¶ 18; S.C. CODE ANN. § 59-39-112.[22] They may be assessed on neutral criteria, such as the hours of instruction, the content of the syllabus, the texts used, and the qualifications of the teacher. *Id.* This is in line with the holding in *Lanner,* where the court described permissible types of evaluation for released time programs: "[s]chool authorities may inquire into the training of teachers and whether a particular course covered a subject for which 'credit' could be granted. Such inquiry is analogous to the state's constitutional perusal of full-time private schools." *Lanner,* 662 F.2d at 1361. The state law follows instructive precedent and is designed to minimize entanglement. The School District goes one step further. The School District avoids even the hint of entanglement by accepting SCBEST credits through Oakbrook, allowing Oakbrook to review the course in its place. *See* Cmplt. ¶ 35. By accepting credits through Oakbrook, the School District avoids the "comprehensive, discriminating, and continuing state surveillance" that *Lemon* and *Lambeth* warned against.

<blockquote>

2.      *Provision of addresses avoids entanglement by ensuring no public funds flow to SCBEST.*

</blockquote>

Plaintiffs also object that the School District provided SCBEST with parents' addresses. Cmplt. ¶ 9. This is another well-accepted method of minimizing entanglement. In *Smith,* the school district provided religious groups with address lists, which the religious groups used to mail permission forms out to parents. *Smith,* 523 F.2d at 122. Nowhere does the Fourth Circuit suggest that this action was problematic. *Zorach* itself cited the production of release forms by the religious groups (rather than the school) as evidence that no public funds were spent on the

---

[22]     Plaintiffs' claim that the School District has delegated the "the governmental function of granting public school grades," Cmplt. ¶ 27, is nonsensical, since the existing transfer program allows private schools, religious and secular, to assign grades which may later be accepted as

program.  *See Zorach,* 343 U.S. at 308.   Provision of addresses to SCBEST is evidence that the

School District was avoiding entanglement, not seeking it.

> 3. *Plaintiffs' speculation that the School District might someday evaluate the content of SCBEST's programming—in contradiction of state statute— fails to state an Establishment Clause claim.*

Plaintiffs speculate at some length about the ramifications of testing and evaluation of

SCBEST classes by the School District.  *See, e.g.,* Cmplt. ¶¶ 29–36.  But the Plaintiffs never

allege that such testing and evaluation has actually taken place.  *See id.*  In *Lemon* analysis,

courts "must not speculate about a statute's application" but must instead "examine the available

data to determine the statute's 'inevitable' effects."  *Brown* v. *Gilmore,* 258 F.3d 265, 275 (4th

Cir. 2001).[23]  Plaintiffs' claims here are speculative in the extreme.  They claim that if SCBEST

could not get transfer credits through Oakwood, the School District ***might*** have to engage in

potentially entangling testing of SCBEST students.  *See* Cmplt. ¶¶ 29–35.  This is far from the

"inevitable effects" considered in *Brown.*  Plaintiffs' allegations are built entirely on a state

*regulation* mandating testing for course knowledge in some cases.  *See* Cmplt. ¶¶ 29–34.  But

that regulation, if applied to SCBEST classes, would conflict with recently enacted state *law* that

specifically states that credits for released time classes may not be awarded if "the decision to

award elective Carnegie units…involve[s] any test for, religious content or denominational

affiliation."  Cmplt. ¶ 18; S.C. CODE ANN. § 59-39-112.

So, too, the regulation mandating temporary assignments, *see* Cmplt. ¶ 34, would conflict

with state law mandating that "no public school personnel are involved in providing the religious

instruction."  Cmplt. ¶ 17; S.C. CODE ANN. 59-1-460.  Plaintiffs' claims on this point are not

---

public school grades.
[23]    Although *Brown* was a pre-enforcement challenge, it is akin to the claim made here: Plaintiffs do not allege that the state regulations in question have ever been applied, merely that they might be.  *See* Cmplt. ¶¶ 30-36.

only speculative, they are prohibited by controlling state law.  If the Transfer Regulations and controlling state law were to come into conflict, the "inevitable effect[]" would be that the new state law preempts the transfer regulations.  S.C. CODE § 59-5-60 (state board of education has powers to "[a]dopt policies, rules and regulations not inconsistent with the laws of the State"); *South Carolina Coastal Conservation League* v. *South Carolina Department of Health and Environmental Control*, 669 S.E.2d 899, 913 (S.C. Ct. App. 2008) ("When there is a conflict between a statute and a regulation implementing the statute, the statute is controlling.").

State law prohibits any excessive entanglement.

## CONCLUSION

For the foregoing reasons, Plaintiffs' complaint should be dismissed with prejudice.

Respectfully Submitted,

/s/Kenneth E. Darr, Jr.
Kenneth E. Darr, Jr. (Fed. I.D. #989)
Lyles, Darr & Clark, LLP
104 N. Daniel Morgan Ave., Suite 300
Spartanburg, South Carolina 29306
kdarr@ldclaw.com
Telephone: (864) 585-4806
Facsimile: (864) 585-4810


Eric C. Rassbach (*pro hac vice* pending)
Lori H. Windham (*pro hac vice* pending)
The Becket Fund for Religious Liberty
1350 Connecticut Ave., NW, Suite 605
Washington, DC 20036
erassbach@becketfund.org
lwindham@becketfund.org
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

Attorneys for Defendant
Spartanburg County School District No. 7

August 31, 2009
Spartanburg, South Carolina