```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF SOUTH CAROLINA
                   SPARTANBURG DIVISION


ROBERT MOSS, ET AL.,          )
                              )
            Plaintiffs,       )    7:09-1586
                              )
        -versus-              )    February 9, 2011
                              )
                              )    Greenville, SC
SPARTANBURG COUNTY SCHOOL     )
DISTRICT NO. 7,               )
            Defendant.        )


                TRANSCRIPT OF MOTION HEARING

        BEFORE THE HONORABLE HENRY M. HERLONG, JR.
         SENIOR UNITED STATES DISTRICT JUDGE, presiding


A P P E A R A N C E S:

For the Plaintiffs:          AARON J. KOZLOSKI, ESQ.
                             PO Box 11902
                             Columbia, SC 29211

                             GEORGE DALY, ESQ.
                             139 Altondale Avenue
                             Charlotte, NC 28207

For the Defendant:           KENNETH W. NETTLES, JR.
                             PO Box 5726
                             Spartanburg, SC 29304

                             ERIC N. KNIFFIN, ESQ.
                             ERIC C. RASSBACH, ESQ.
                             3000 K. Street NW, Ste. 220
                             Washington, DC 20007

Court Reporter:              KAREN E. MARTIN, RMR, CRR
                             300 E. Washington Street
                             Room 304
                             Greenville, SC 29601


The proceedings were taken by mechanical stenography and
the transcript produced by computer.
```

2

1                    Wednesday, February 9, 2011

2              THE COURT:  This matter's before the Court on

3    cross-motions for summary judgment.  There are other

4    motions pending, too, but let me begin by asking, it

5    appears to me that the essential material facts are not in

6    dispute.  Are they?  I'll ask both sides that.

7              MR. KNIFFIN:  We'd submit there are no real

8    factual issues.

9              MR. DALY:  I would agree with that, Your Honor.

10             THE COURT:  I was thinking so.  So it's a matter

11   of law based on the facts that we have.  There are some

12   Supreme Court cases that are fairy close on point to

13   support both sides really.  The question, I guess, really

14   is whether the school district has exceeded what's allowed

15   in allowing these programs.

16             Let me just hear from the defendant school

17   district.

18             MR. KNIFFIN:  I'm sorry.  Your question, Your

19   Honor?

20             THE COURT:  I just want to hear from you on why

21   you think you should get summary judgment.

22             MR. KNIFFIN:  Sure.

23             THE COURT:  And you may stand when you address

24   the Court.

25             MR. KNIFFIN:  Thank you, Your Honor.  With the

1    Court's permission I will start with an argument on the

2    merits of the district's summary judgment motion.  The

3    district would submit that for two reasons the Court

4    should grant the district's motion for summary judgment.

5          First of all, the plaintiffs have failed to

6    distinguish the facts of this case and to take it outside

7    the realm of a typical release-time case.  And secondly,

8    once this is recognized as a release-time case, that the

9    analysis is straightforward.

10          **THE COURT:**  What you are saying is the Supreme

11    Court has approved certain release-time programs.

12          **MR. KNIFFIN:**  Correct, Your Honor.  That the

13    accommodations that the school district has made in this

14    case are in some regards different than the accommodations

15    that have been made in other cases but that doesn't mean

16    it should be treated any differently.  And, therefore, the

17    analysis under the Lemon test, under the recent Fourth

18    Circuit case of Glassman and under other Fourth Circuit

19    cases is Ehlers-Renzi and Smith v. Smith go right to the

20    Lemon test.  And we believe that under that test the

21    school district's actions and its policy have not violated

22    the purpose prong, the effects prong and certainly there

23    is no entanglement.

24          **THE COURT:**  Well, you said there is no

25    entanglement.  They argue that you are giving credit for

1    religious education.  And I believe they argue, too, that

2    the school district adopted a policy of accepting credits

3    from private schools.  Are they alleging all of the

4    private schools in Spartanburg or the surrounding area are

5    Christian schools?

6            **MR. KNIFFIN:**  I'm not aware that plaintiffs have

7    made that representation.  I believe they have represented

8    that most of the private schools in the area are

9    Christian.

10           **THE COURT:**  But I believe the policy is not

11   designed to accept credit from only Christian schools, is

12   it?

13           **MR. KNIFFIN:**  No, sir.  The policy itself

14   anticipates that there will be any one of a number of

15   institutions that may seek to take advantage of the

16   district's release time policy.  And as the district said

17   to both plaintiffs and plaintiff's counsel before they

18   filed their complaint, the district was open to a Jewish

19   release-time program or Muslim release-time program.  So

20   this was not --

21           **THE COURT:**  Is there a Muslim release-time

22   program?

23           **MR. KNIFFIN:**  No.

24           **THE COURT:**  But if there was, you would accept

25   it?

1       **MR. KNIFFIN:** Yes, Your Honor. For ten years

2  before this policy was adopted, since 1997, there's been

3  only one group in the community that has approached the

4  school district seeking opportunity to offer release time

5  and that is the same organization that approached the

6  school district and recommended this policy.

7       **THE COURT:** All right.

8       Let me hear from the plaintiffs then.

9       **MR. DALY:** May it please the Court? I'm George

10  Daly of the Charlotte, North Carolina Bar.

11      **THE COURT:** Glad to have you.

12      **MR. DALY:** Thank you. I appreciate the

13  opportunity to come and talk to the Court. I want to

14  start out by talking to you about the entanglement issue,

15  if I may. I think it's a clear basis for a decision --

16      **THE COURT:** Before we get there, why don't we

17  talk about standing. Don't you have a problem with

18  standing?

19      **MR. DALY:** I don't think I do, Your Honor.

20  There are two ways that the plaintiffs can get standing.

21  The first is by being parents of school children who are

22  subjected to the release-time program and children who are

23  subject to the release-time program. The Zorach case --

24      **THE COURT:** When you say subject to it, what do

25  you mean?

6

1      **MR. DALY:**  I mean the child goes to a school

2   that has a release-time program.

3         **THE COURT:**  Okay.

4         **MR. DALY:**  And the Zorach case from 1952 in

5   Footnote 4 says, no problem of the court's jurisdiction,

6   where standing is jurisdictional, no problem of the

7   court's jurisdiction is posed in this case since, unlike

8   the Derimus case (phonetic), which was a taxpayer's case

9   --

10         **THE COURT:**  And you have one plaintiff, I

11   believe, who is presently enrolled; is that right?

12         **MR. DALY:**  One plaintiff's child is presently

13   enrolled and he is a senior.  And the other plaintiff's

14   child was enrolled while she was a minor.  She is now a

15   first-year college student.

16         **THE COURT:**  Well, she's gone so she has no harm,

17   does she?

18         **MR. DALY:**  Well, as the defendant's pointed out

19   to me, standing is determined as of the time you file the

20   complaint.  And so she had standing then and she continues

21   to have standing.  Her case is not moot because she's

22   asked for a dollar in exemplary damages.

23         **THE COURT:**  Okay.

24         **MR. DALY:**  The Zorach case says no problem of

25   the court's jurisdiction is posed because appellants are

1   parents of children currently attending school subject to

2   the release-time program.  That fits our hand like a glove

3   as to all our individual plaintiffs.  They are ripe within

4   the heartland of what's necessary --

5          **THE COURT:**  I believe you alleged -- one thing I

6   was curious about, one of the things you allege from one

7   of the parents of one of the students was that the parent

8   thought the student who was attending there would feel --

9   she would have some type of bad feelings because of this

10   program or something.

11          **MR. DALY:**  Yes.  I think Mr. Moss alleged that

12   he felt his -- he had observed that his child was

13   disturbed by the fact of this program.

14          **THE COURT:**  And I just get -- that piqued my

15   curiosity.  How many -- approximately how many students

16   are presently in the release-time program?

17          **MR. DALY:**  I think that -- I don't know

18   presently.  I think there have been 20 or 25 in the course

19   of the last few years.

20          **THE COURT:**  Twenty or 25.  And how many students

21   were eligible for the program?

22          **MR. DALY:**  Five hundred, I believe, more or

23   less.

24          **THE COURT:**  Five hundred?  So if she's one of

25   the 480 who don't participate, she feels bothered by the

1   fact that 20, over the years -- that's pretty much

2   stretching.

3       **MR. DALY:**  470 I would say as a matter of

4   arithmetic, Your Honor.

5       **THE COURT:**  Well, I thought you said 20.  That's

6   pretty much stretching the limit.

7       **MR. DALY:**  Well, they clearly, we think, have

8   standing under the Zorach case.  That was the same case.

9   It was children -- well, it didn't have the grade in it,

10  but as far as standing, it's the same case.  Children were

11  being released to go to religious services.  And the

12  Supreme Court unanimously said they are parents of

13  children currently attending schools subject to the

14  release-time program.

15      **THE COURT:**  So here they are going for -- this

16  release-time program allows them to go for religious

17  instruction, do they not?

18      **MR. DALY:**  Right.

19      **THE COURT:**  Okay.

20      **MR. DALY:**  May I just make one more point about

21  standing?

22      **THE COURT:**  Sure.

23      **MR. DALY:**  Alternatively, to the standing under

24  the Zorach case, we have standing as sort of people who

25  are affected and psychologically disturbed by this event.

1    And I would rely on the Suhre case, S-U-H-R-E, in the

2    Fourth Circuit.

3         THE COURT:  And who is psychologically disturbed

4    by this program?

5         MR. DALY:  Well, the parents and the children.

6    They have all made affidavits that it's a very bothersome

7    program to them.  The daughter testified at great length

8    that it made her feel like an outsider.

9         THE COURT:  That was what I was getting to.

10   She's an outsider and she's in the majority of 98 or

11   7 percent or something like that?

12        MR. DALY:  Well, as far as students who don't

13   take release time, yes.  But as far as being emotionally

14   offended by it, it's -- I don't think --

15        THE COURT:  So she's -- and I'm not -- for the

16   purpose of this, it may be fine, but a few -- a handful of

17   students out of five hundred go for this program and she's

18   psychologically disturbed by it?

19        MR. DALY:  There is a case in the Supreme Court

20   that's quite similar.  It's cited in my brief called Santa

21   Fe Independent School District decided in 2000.  And it's

22   a case about a policy down in Texas.  And the application

23   of the policy, the policy concerned prayer at football

24   games.  And there were a few students --

25        THE COURT:  Oh, I don't doubt that.  If I'm

1    attending a football game and I'm in the stands and

2    somebody says, let's all stand and we'll have a Christian

3    prayer, I don't want to hear it.  But if I'm in a campus

4    of five hundred students and a handful leave at a certain

5    time of the day to leave school, I don't have to even know

6    about it.

7              **MR. DALY:**  Well, she said one of them was her

8    friend and it affected her relationship with her friend.

9              **THE COURT:**  Okay.  And I imagine -- well, okay.

10   You know, I guess I'm getting off the point.  I just find

11   that that's -- you know, I guess she could adopt a friend

12   who goes to church every Sunday and I guess that offends

13   her that her friend goes to church every Sunday.

14             **MR. DALY:**  I understand there are always fights

15   about standing.  But the Supreme Court in the Zorach case

16   said if you have got release time and you are a parent of

17   a student who is there, you've got standing.

18             **THE COURT:**  Okay.  Let's move on to the merits

19   of your claim then.

20             **MR. DALY:**  All right.  The clearest point of the

21   case, I think, is the entanglement, the third basis.  And

22   this is an unusual case in many ways.  Most Establishment

23   Clause cases you see involve the government intruding into

24   religion, putting up a Ten Commandments display on your

25   walls here or putting a creche out in front of the court.

11

1          **THE COURT:**  Or a pageant or some Christian --

2          **MR. DALY:**  Yeah.  This is a different type of

3    case.  This is where the gravamen of the complaint is that

4    the religious organization is intruding into the halls of

5    government.

6          **THE COURT:**  Well, was it the Zorach case where

7    that was approved?

8          **MR. DALY:**  Yes.  It is clearly okay to have

9    release time.  The reason this case is here is an elective

10   credit, which imports a grade, is given for it.  If it

11   weren't for that, the case wouldn't have been brought,

12   obviously, because Zorach says release time is okay.  The

13   Fourth Circuit, when it got hold of the Zorach case, they

14   didn't care for it too much.  But they said they were

15   bound by it and they followed it in Smith against Smith.

16   So that's clear.

17          But in this case you've got a defendant

18   accepting an academic grade awarded by a religious

19   organization.  I don't think there is any dispute about

20   that fact.  And a high school grade is an important

21   discretionary governmental function.  A high school grade

22   can make the difference between getting into college or

23   not getting into college.

24          **THE COURT:**  Well, now, just on that point, isn't

25   the record fairly clear that -- I should ask it this way.

1    There is no evidence, is there, that there's an abuse of

2    the grading system, is there?

3           **MR. DALY:**  Not with --

4           **THE COURT:**  For instance, they don't just

5    automatically give A's to everybody.  In fact, they have

6    had much lower grades, have they not?

7           **MR. DALY:**  They have given some F's.  This

8    particular release-time provider, SCBEST, we weren't

9    inquiring as to how they gave grades except as a potential

10   matter.  And the grades that they gave appeared to be

11   across the spectrum.

12          There is an exhibit, I believe in the summary

13   judgment papers, that shows the grades that they gave at

14   another high school in Spartanburg called Dorman High

15   School.  That was one of the early numbered exhibits in

16   the depositions and it shows some strikingly high grades.

17   I think that's in the record.

18          But the real issue is whether this is a

19   potential, whether they could give a grade to a student

20   who needed one credit to graduate and he was failing their

21   grade but for religious reasons --

22          **THE COURT:**  Are you suggesting that there are no

23   decisions out of the Fourth Circuit or Supreme Court in

24   which the courts have authorized to accept credits from a

25   Christian school to a public school?

1      **MR. DALY:** That's correct, Your Honor. I think

2   this is quite an open issue in those forums.

3      **THE COURT:** Okay.

4      **MR. DALY:** What we rely on principally is the

5   Larkin case. And Larkin started out by quoting -- or

6   didn't start out, but its discussion of the third prong of

7   Lemon quotes -- yeah, the third prong of Lemon quotes from

8   the Lemon test. And it says, "Under our system, the

9   choice has been made that government is to be entirely

10  excluded from the area of religious instruction and

11  churches excluded from the affairs of government." And

12  they underlined that, churches excluded from the affairs

13  of government. And the Supreme Court doesn't underline

14  too much -- or they italicized actually. And here they

15  are italicizing a quote from one of their earlier cases.

16      Then it started talking about what the core

17  rationale of the Establishment Clause is and it drew those

18  same two distinctions. It quoted an old case that says,

19  "The structure of our government has, for the preservation

20  of civil liberty, rescued the temporal institutions from

21  religious interference." That's the same thing as

22  churches must be excluded from the affairs of government.

23  And it quoted an 1872 case which quoted an 1843 South

24  Carolina Court of Appeals case.

25      So this principle's been around a long time.

14

1    Government keeps out religion and religion keeps out of

2    government.  This is the religion keeps out of government

3    case which is an unusual case.  This meant that the

4    framers did not set up a system of government in which

5    important discretionary governmental powers would be

6    delegated to religious institutions.  That's what they

7    have done here.  They have delegated the power to give a

8    high school grade to a religious institution.

9          Now, that's the argument.  It's very

10    straightforward and simple.  You read the Larkin case and

11    it's right there.

12          Now, the defendant has three arguments that it

13    makes against that position.  First, it says that we have

14    to show that the government is taking over church

15    functions.  Well, we don't have to show that.  We have the

16    church taking over government functions.

17          But they cite a Supreme Court case called the

18    Mueller case, M-U-E-L-L-E-R, against Allen from the 80's.

19    And they say that Mueller held that you need a

20    comprehensive, discriminating and continuing state

21    surveillance of religion for a challenged action to run

22    afoul of the entanglement problem.  Well, when I read

23    that, I thought the Larkin case had been overruled.

24    Because if that were true, I would be in trouble.

25          But Mueller was a tax case.  It's one of these

1    cases where the government is getting involved in

2    religion.  They had a tax credit for giving books to

3    nonpublic school children, many of which were parochial

4    school children, but they only gave secular books.  So the

5    government had to decide what's a secular book and what's

6    a religious book.  And the Supreme Court said you are

7    getting too much into the business of religion.  That's

8    not this kind of case.  We say that religion is getting

9    too much into the business of government.  So that case

10   has very little, if anything, to do with what we are at

11   here.

12           Then they say, well, everybody's doing it.

13   School districts all over the United States accept these

14   credits.  If you rule in the plaintiff's favor, you are

15   going to be upsetting a nationwide apple cart and the

16   apples are going to be hard to deal with.  Well, there is

17   not any proof of that.

18           I take that back, one little piece of proof I

19   will tell you about.  They have a footnote in Docket 84 at

20   Note 14.  And they say there is a lot of testimony that

21   these sorts of courses get accepted for credit.  And I

22   looked at all those things they cite.  And they all talk

23   about giving credit for religion courses.

24           Now, there are two kinds of religion courses you

25   have got to talk about.  One is what SCBEST is teaching

1  where, according to their letter, they teach you to live

2  as a Christian would live.  Basically, as the policy says,

3  it is for religious instruction.  We are going to instruct

4  you how to be --

5          THE COURT:  Christianity.

6          MR. DALY:  Yeah.  There is another type of

7  religion course which I refer to as, you know, the

8  influence of the Bible on Shakespeare.  And you can teach

9  that over at Spartanburg High School.  And it would be a

10 real interesting course because you really can't

11 understand much about, particularly Southern literature,

12 you can't read Faulkner unless you know what the Bible's

13 about.  You can't read it with much understanding.

14         None of their proof tells you which of these

15 types of cases they are talking about.  So there is not

16 any proof that the Christianity type of case is being

17 brought in except there is one affidavit by a man named

18 Mr. Wolfe who is the Guidance Director at Spartanburg.

19 And he says we got in a transcript on -- from a transfer

20 student.  And it showed that this transfer student had

21 taken a religious instruction course in South Carolina

22 which, of course, is not any news because the state

23 statute allows it.  But outside that one case in South

24 Carolina, there is no proof that you are dealing with any

25 kind of nationwide problem.  It may well be that the only

1    thing that transfers is the Bible and Shakespeare.

2         THE COURT:  Well, that's not really an issue

3    anyway unless courts have approved it.  And then there is

4    argument if the courts have approved it, then that is

5    something to consider.  And it depends on what courts

6    approved it.

7         MR. DALY:  You are quite correct.  There is no

8    authority on the issue.

9         THE COURT:  Okay.

10        MR. DALY:  The third objection that they have to

11   the entanglement issue, the third Lemon issue, is the case

12   out of the Tenth Circuit called Lanner against Wimmer.

13   It's a little hard to pronounce.  Lanner against Wimmer.

14   And that case is discussed extensively in our briefs.  I'm

15   not going to repeat my discussion there but I want to say

16   a few things about it.

17        Number one, it was decided before Larkin.  And

18   it does not anticipate the Larkin analysis that what we

19   are dealing with here is churches moving into government.

20   And it just gets very confused.  It has a very long dictum

21   about what you can do to accept grades from religious

22   schools.  And for that dictum, it relies on a Supreme

23   Court case which I have cited called Board of Education

24   against Allen.

25        What Allen dealt with is the proposition that

18

1    the state can go over to the religious school and tell

2    them to do certain things certain ways.  They can tell

3    them to hire a competent teacher for reading, writing and

4    arithmetic because parents have a constitutional right to

5    send their children to private schools including religious

6    schools.  That's the Pierce against Society of Sisters

7    case.

8         But the state has a right to enforce its

9    interests in secular education, whatever that means.  But,

10   clearly, it means reading, writing and arithmetic.  So

11   they can require that the parochial school teach Calculus

12   I, for example.  Well, the Lanner court flips that on its

13   head and says what they can do to check out the secular

14   religion over there, they can also do toward the religious

15   religion.  And they say that the state can inquire into

16   the training of teachers.

17        Well, clearly, the state, if the parochial

18   school is teaching a course called How to Become a Priest,

19   and they have a priest teaching it, the state can't go

20   over there and tell them you can't have this course taught

21   with a priest.  That's interfering with their religion.

22        They also say that they can determine, that is,

23   the government can determine whether a particular course

24   covered a subject for which credit could be given.  That

25   seems to me like they may be saying we'll only accept

1    credit for Shakespeare and religion.

2         So the Lanner case, it looks good when you first

3    read it.  But it's a very long dictum and it's based upon

4    a misunderstanding of the relationship of the state being

5    able to tell the religious school what it can do when it

6    teaches secular subjects but not be able to tell it what

7    it can do when it teaches religious subjects.

8         THE COURT:  All right.

9         Let me hear your response.

10        MR. KNIFFIN:  Thank you, Your Honor.  I guess

11   the first --

12        THE COURT:  Let's talk about standing.  You

13   agree the Larkin case says in the footnote if you have a

14   student there, that gives you standing?

15        MR. KNIFFIN:  No, Your Honor.  The Zorach case

16   that plaintiff's cite --

17        THE COURT:  Zorach case?

18        MR. KNIFFIN:  The Zorach case was decided, it

19   came to the Supreme Court through the New York courts and

20   it was on the pleadings.  And the plaintiffs had alleged

21   that their students had been coerced by the program at

22   issue.  So the issue before the Supreme Court there, it

23   was not like here, where the plaintiffs were claiming

24   standing, merely the fact that they were in the same

25   school building with other students who were taking

1    advantage of a program of released time.  They were

2    talking about -- the allegations were that these students

3    had been coerced.  And that is not the situation.

4         In this case, Plaintiff Melissa Moss said that

5    her only interaction with the released-time course was she

6    was sitting in class and she oversaw a friend's syllabus

7    of the course.  She did say in her deposition that she

8    felt more distant from her friend after she realized that

9    he was taking the course.  But it wasn't because of

10   anything the friend had done.  And also it didn't have

11   anything to do with --

12        **THE COURT:**  Do you have to be offended or can't

13   just a student that's there say I'm part of this school

14   and this school has this program and I object to it?

15        **MR. KNIFFIN:**  There is no case that has granted

16   either parents of students or students themselves standing

17   on that basis.

18        **THE COURT:**  All right.

19        **MR. KNIFFIN:**  Melissa Moss said that she felt

20   uncomfortable, a little different about this student only

21   because of the lawsuit.  She thought maybe this student

22   would find out about the lawsuit and think differently

23   about her.  It wasn't that she felt differently about this

24   student or felt differently about the school because this

25   friend of hers who continued to be a friend of hers was

21

1    taking this release-time course.

2            THE COURT:  Plaintiff's attorney represents to

3    the Court that there has never been court approval of a

4    public school accepting credits from a religious school.

5            MR. KNIFFIN:  We do not have a case that has

6    held that.  But I would submit, Your Honor, it is an

7    exceedingly common practice.  And there is a lot of things

8    that are so exceedingly common that courts just simply

9    have never had the occasion to rule on them.  That doesn't

10   mean it's really a question of unconstitutional.

11   Certainly in this case there is plenty of testimony that

12   students transferred regularly from Oakbrook Preparatory

13   School to public schools throughout the area.  And there

14   has never been a problem of those students receiving

15   credit for their secular courses or for their religion

16   courses.  And furthermore --

17           THE COURT:  So what you are saying is that this

18   release time accepting credits is nothing different than

19   having someone gone to a public school and transferring --

20           MR. KNIFFIN:  From a private school to a public

21   school, Your Honor.

22           THE COURT:  -- from a private school to a public

23   school.

24           MR. KNIFFIN:  The only other federal case that

25   has discussed elective credit for release time is the

1    Lanner case from the Tenth Circuit.  In that opinion, six

2    times in the opinion the Tenth Circuit compared elective

3    credit for release time to students transferring from

4    private religious schools to public schools.  It's an apt

5    comparison.

6           And the biggest -- I think perhaps the biggest

7    obstacle of the plaintiff's case is what their argument

8    really is that two rights make it wrong.  It's okay to

9    have release time.  Release time is constitutional.

10   Plaintiff's counsel has recognized that even though his

11   plaintiffs -- his clients don't like it.

12          And furthermore, it is uncontroversial that

13   students have for decades transferred from private schools

14   to public schools.  And where those schools are

15   accredited, what happens at Spartanburg High School and at

16   any high school, they look at the transcript.  The

17   transcript comes from an accredited school.  The school

18   district recognizes those credits.  And what the

19   plaintiffs are somehow alleging is that when these two

20   things are done at the same time, all of the sudden it

21   becomes unconstitutional.  Both of them are -- there's

22   substantial evidence in the record that this is something

23   that Oakbrook is familiar with and other school districts

24   in the area are familiar with.

25          **THE COURT:**  Does the record reflect how many

1    students are in -- the defendant is Spartanburg County

2    School District No. 7.  How many high school students

3    there are in the --

4            **MR. KNIFFIN:**  Yes, Your Honor, one moment.  I'm

5    looking to the declaration.

6            **THE COURT:**  Not that it matters that much.  I'm

7    just curious.

8            **MR. KNIFFIN:**  Approximately 20 students have

9    received credit.  This is from January 2007 to the

10   present.  And of those students, there have been more F's,

11   D's and C's than there have been A's.

12           **THE COURT:**  My question was how many students

13   are there, high school students are there in Spartanburg

14   County School District No. 7, approximately?

15           **MR. KNIFFIN:**  About five hundred in the class.

16           **THE COURT:**  He thought it was five hundred.  All

17   right.

18           **MR. RASSBACH:**  Your Honor, if I could just add,

19   Eric Rassbach for defendant.  I think you had a

20   denominator in the discussion with plaintiff's counsel a

21   little bit wrong in that the 20 students is over several

22   years.  So we are talking about --

23           **THE COURT:**  I understand.  He said since '07

24   till, so approximately three years.

25           **MR. RASSBACH:**  So 20 students out of 2,000, not

1    five hundred, so something along those lines.  So it is an

2    even smaller percentage of kids who are doing this.  And

3    if anything, they are the outsiders, not Ms. Moss.

4              **THE COURT:**  Okay.

5              **MR. KNIFFIN:**  Your Honor, in other release-time

6    cases, cases that have taken place in elementary schools

7    where courts have recognized that students are more

8    impressionable, courts have approved release-time programs

9    where a vast majority of students have taken release time.

10             In Pierce, a Second Circuit case, the

11   allegations were that participating student were harassing

12   non-participating students.  The court approved release

13   time in that situation.  So for the plaintiffs to allege

14   they have been made to feel an outsider under these facts,

15   it's really thin skinned compared to other release-time

16   cases.

17             **THE COURT:**  All right.

18             Just briefly, Mr. Daly, on the situation that he

19   raises.  What's the difference in a student receiving a

20   credit for a release-time program to go into his or her

21   transcript, what's the difference -- why would there be a

22   difference in that compared to a student who transfers

23   over, say, in the 10th grade and has been totally in a

24   Christian school and the school district accepting those

25   credits which have been earned in the Christian school?

1     **MR. DALY:**  Well, several answers.  Number one,

2  the case you pose is not the case here.  Number two --

3     **THE COURT:**  What do you mean it is not the case

4  here?  Doesn't the record reflect that Spartanburg 7

5  accepts transfers from and the courts have approved

6  transfers from Christian schools?

7     **MR. DALY:**  No.  There is -- well, Spartanburg 7

8  takes the position that if you are from an accredited

9  school, they'll accept you.  Yes, they do that.  The

10  record, there's no --

11     **THE COURT:**  You say the difference is this

12  program here that you are complaining about is not from an

13  accredited school.

14     **MR. DALY:**  Right.  And --

15     **THE COURT:**  Well, if it was accredited, then it

16  would be okay?

17     **MR. DALY:**  No, we don't say that.

18     **THE COURT:**  Well, why -- what's the difference

19  if a student has gone kindergarten through 10, 10th grade

20  in high school, total Christian school, and then says I

21  want to go to Spartanburg 7.  And they send the

22  transcripts over.  Spartanburg County School District --

23  Spartanburg School District 7 reviews the transcript and

24  says, okay, we'll accept you and you'll now be in the 11th

25  grade?

26

1          **MR. DALY:**  Well, the difference is the parents

2    elected through grades 1 through 10 to send that child to

3    a private, separate school --

4          **THE COURT:**  Right.

5          **MR. DALY:**  -- which they have a constitutional

6    right to do.

7          **THE COURT:**  Okay.

8          **MR. DALY:**  In our case, the parents elected to

9    send their children to the public school.  And the public

10   school in advance decides to allow them to go out one

11   course a day and get a grade --

12         **THE COURT:**  Well, it's a dual consent, is it

13   not?  The school district allows it under this program you

14   are complaining about --

15         **MR. DALY:**  Right.

16         **THE COURT:**  -- but the parent has to say I want

17   my child to go for that program.

18         **MR. DALY:**  That's right.

19         **THE COURT:**  So the school district is not

20   sending them over there without the consent of the parent.

21         **MR. DALY:**  No, but the school district is

22   allowing it.  Whereas, in the case of the parochial school

23   or the religious school, the school district doesn't have

24   any say about it.  The constitution allows it.  But these

25   parents have decided to bring their children into public

1  schools.

2         THE COURT:  I find it -- I do find that argument

3  to be -- it's hard for me at this point to see any

4  difference in that.

5         MR. DALY:  Well, even if you don't see any

6  difference in it, that doesn't mean that both sides of it

7  are constitutional.  We would say that both are

8  unconstitutional.

9         THE COURT:  I thought you conceded, excuse me

10  for interrupting.  I thought you conceded that when a

11  child had gone to a parochial school and transfers over,

12  it is constitutional for that public school to accept

13  those credits earned.

14         MR. DALY:  No.  Pardon me if I have made that

15  concession.  I did not intend to.

16         THE COURT:  Haven't the courts upheld that?

17         MR. DALY:  No.  As far as I know there are not

18  any cases on that.  I would concede that reading, writing

19  and arithmetic must be accepted.  But if you have a child

20  who's been in a religious school for ten years, he's taken

21  reading, writing, arithmetic and prayer, practice of

22  prayer, and two-thirds of his grades are in the three R's

23  and one-third are in the practice of prayer, we do not

24  think that the public school can give him the A-plus that

25  the prayer leader gives him.

1    THE COURT:  Well, that's a fine distinction.  I

2  understand that.  So in other words, if they were

3  substituting, say, the Story of Jesus for some other

4  social and giving credit for it --

5    MR. DALY:  Right.

6    THE COURT:  -- you would allege that --

7    MR. DALY:  If they were teaching Shakespeare's

8  influence on the Bible or vice versa, we have no problem.

9    THE COURT:  All right.  I appreciate that.

10    MR. KNIFFIN:  Your Honor, if a student is at

11  Oakbrook -- well, first of all, Oakbrook has been clear

12  that there is no difference from their perspective between

13  the religion course that was taught by SCBEST and the

14  religion course they teach their students.  That the

15  religion course --

16    THE COURT:  Well, as Mr. Daly argues, he said it

17  would be unconstitutional.  Does District 7 accept credits

18  earned for pure religious instruction, credits given at

19  the parochial school?

20    MR. KNIFFIN:  When a student comes to District 7

21  and presents transcripts from an accredited school, the

22  school district accepts those credits at face value.

23    THE COURT:  I know.  That's not my question.  My

24  question is do you ever give credit for credits earned for

25  pure religious instruction?

1          **MR. KNIFFIN:**  Well, the court said in Lanner it

2     would be inappropriate for a school district to look at

3     proposed credit for a release-time class and to decide

4     whether or not there was too much religious content to it.

5     That was specifically what the Tenth Circuit said.

6          **THE COURT:**  Let's just go back to my question.

7          **MR. KNIFFIN:**  I'm sorry, Your Honor.

8          **THE COURT:**  And I'm sure this happens all the

9     time.  I don't know how often it happens, but someone has

10    been in a parochial school in Spartanburg.  And then they

11    decide to go to the public schools and they are in

12    District 7.  I guess my question is, and you might not

13    know the answer to this, have there been any credits for

14    pure religious instruction that you have accepted in lieu

15    of credits that you had earned in the public school?

16         **MR. KNIFFIN:**  Well, credits are -- would not

17    be -- those would come in as elective credits.

18         **THE COURT:**  And excuse me.  As counsel for

19    plaintiff's argue, they would have no objection to the

20    basics of reading, writing and arithmetic, those kinds of

21    things, English, those types of things.  But, for

22    instance, do you ever accept a credit for a grade that was

23    given in, say, for instance, something like the Story of

24    Jesus?

25         **MR. KNIFFIN:**  Well, the school district would

1    not inquire as to the religious content of the course.  So

2    I guess if the question is if something that appeared on

3    the transcript that appeared to be religious, the school

4    has never denied a credit simply because the description

5    of a course in a transcript appeared to be religious.

6              THE COURT:  And they don't inquire to that?

7              MR. KNIFFIN:  No, Your Honor.  If the student

8    was at Oakbrook and finished eight semesters, they would

9    receive a high school diploma from the state, approved by

10   the State of South Carolina.  They graduated from high

11   school.

12             So the question is if someone with one semester

13   left in high school then decides they have to transfer,

14   their father loses their job or something like that,

15   transfers to a public school, why should that student be

16   penalized and lose credit for all those religious courses?

17   Why should the public schools serve as function to sort of

18   scrub out all religious courses and say these credits have

19   not really been received?

20             THE COURT:  Well, we don't know what they are

21   giving credit for.  But here, you must agree that this

22   release-time program, they are going over there not to

23   learn -- not to be taught math or reading or arithmetic.

24             MR. KNIFFIN:  Sure.

25             THE COURT:  They are going over there to get

1    religious instruction.

2         **MR. KNIFFIN:**  Yes, Your Honor.  It is a course

3    in religious instruction.  But it is one that meets

4    pedagogical standards of Oakbrook and one that meets the

5    pedagogical standards of Oakbrook's accrediting agency.

6    So it is not like this is just a Bible study or something

7    like that.  This is an academic course.

8         **THE COURT:**  All right.  I appreciate the

9    argument.  I will take this under advisement.

10        Yes, sir?

11        **MR. DALY:**  If the Court please, may I say

12   something else about this?

13        **THE COURT:**  Sure.

14        **MR. DALY:**  We are not interested in any post de

15   facto relief.  I think that's the way to say it.  We are

16   not interested in undoing what's been done.  He talks

17   about some student --

18        **THE COURT:**  You want to stop it from going

19   forward.

20        **MR. DALY:**  We want to stop it from going

21   forward.

22        **THE COURT:**  I understood that.

23        **MR. DALY:**  All right.  Thank you.

24        **THE COURT:**  Yes, sir?

25        **MR. RASSBACH:**  Your Honor, I just wanted to add

1    one point with respect to the entanglement argument that

2    plaintiff's counsel made.  He's just wrong that the

3    entanglement prong can go both ways; that is, we look at

4    whether government is sort of intensively surveying

5    religion.  That's what the entanglement prong is about and

6    that's what we argued in our briefs.  But it doesn't go

7    the other way.

8         THE COURT:  He said that's what his case is all

9    about.

10        MR. RASSBACH:  Right.  And that's where I think

11   he loses because you have to have state action.  It has to

12   be a state actor doing something in order to violate the

13   Establishment Clause.  Religious groups can go and survey

14   and intensively engage with public entities as much as

15   they want to.  They have a First Amendment right to do

16   that.  It doesn't really -- you can't look at and analyze

17   the entanglement prong of the establishment --

18        THE COURT:  Wait a minute.  Let's say that they

19   show up at the school and they knock on the door to the

20   principal's office and say we'd like ten minutes of time

21   when there is -- when everybody is in the auditorium and

22   we want to teach a little religion here.  They have a

23   right to ask but the school, they don't have a right to do

24   that.

25        MR. RASSBACH:  Right, exactly.  And I agree that

1    they can't, you know, have a sermon time or what have you

2    during school assembly.  And certainly, that's not the

3    school district's position.  But you can't shift the focus

4    from what are the religious people doing.  You have to

5    look very precisely at what it is that the government is

6    doing?  And the problem in the cases you are talking about

7    is what the government officials decided to do in response

8    to that request.

9           So you can't -- you know, he was talking about

10   what happened at some other high school that's not with

11   respect to this private SCBEST organization.  It is

12   completely irrelevant to this case.  The only thing that

13   matters in this case is what exactly Spartanburg School

14   District No. 7 did.

15          **THE COURT:**  What you are saying is when the

16   Court looks at entanglement, it has to look at what the

17   school is -- the public school is doing.

18          **MR. RASSBACH:**  Right.  That's the only way you

19   can violate the Establishment Clause is by state action.

20   And that's how they can only get relief under Section

21   1983.

22          **THE COURT:**  I don't know about the state action

23   of you giving credits to -- for religious instruction.

24          **MR. RASSBACH:**  That's the issue.  But then you

25   don't actually have entanglement because the school

34

1    district is very carefully -- the Oakbrook relationship

2    actually helps the school district's position.  It doesn't

3    hurt it.  Because they have actually really tried to do

4    this in a way that doesn't entangle them.  You look at the

5    entanglement standard.  You look at what the school

6    district actually did and --

7         THE COURT:  But you have no court cases which

8    have authorized the approval of the state, the school

9    district giving credit for religious instruction.

10        MR. RASSBACH:  I think that the transfer

11   regulations under the South Carolina law would actually

12   push you in that direction.  And, frankly, this has not

13   been --

14        THE COURT:  Well, the statute -- I'm not

15   criticizing the state just because the state passed a

16   statute, that's what this is.

17        MR. RASSBACH:  I certainly agree.  I sue states

18   all the time.  So I definitely agree with that.

19        What I'm saying is that you can't -- this has

20   actually not been a live issue in this case.  We'd be

21   happy to give the Court some post-argument briefing about

22   the issue of just the issue of whether, say, somebody goes

23   from Oakbrook over to Spartanburg High School, the one

24   semester left, that sort of issue of --

25        THE COURT:  My question was the court -- you

1    don't have any authority where the courts have approved

2    accepting a credit for religious instruction?

3            MR. RASSBACH:  I don't have it right now but --

4            THE COURT:  On a religious subject.  I should

5    say it that way, just on a pure religious subject.

6            MR. RASSBACH:  I don't have any right now but I

7    would -- this was not an issue in any of the briefing,

8    particularly down to that level.

9            THE COURT:  I will give everyone until Friday if

10   they want to submit anything in addition.

11           MR. RASSBACH:  Okay.

12           THE COURT:  Thank you.  Appreciate it.

13           MR. DALY:  Judge, do we need to come to the

14   calendar call on Monday?

15           THE COURT:  No, you do not.

16           MR. DALY:  Do you want us to continue with the

17   pretrial schedule?

18           THE COURT:  Yes, I'm going to rule on this as

19   soon as I can.  It's before the Court on summary judgment,

20   cross-motions for summary judgment.  And everyone -- and

21   you have already agreed that the facts are not in dispute.

22           MR. DALY:  Right.

23           MR. RASSBACH:  I think we still have some

24   deadlines about exhibits and things like that that would

25   be moving towards a bench trial.

1          **THE COURT:**  You can just hold that in abeyance.

2          **MR. RASSBACH:**  All right.

3          **MR. DALY:**  Thank you.

4          **THE COURT:**  Well, we don't need a trial.

5          **MR. DALY:**  Right.

6          **THE COURT:**  Why would we need a trial if you

7   agree on the facts?

8          **MR. RASSBACH:**  Right.  We have a scheduling

9   order that says that --

10          **THE COURT:**  You are okay on that.  Thank you.

11          **MR. KNIFFIN:**  Thank you, Your Honor.

12          **MR. DALY:**  Thank you, Judge.

13                              ***

14   I certify that the foregoing is a correct transcript from

15   the record of proceedings in the above-entitled matter.

16

17      s/Karen E. Martin                    2/10/2011

    _____        _____
18   Karen E. Martin, RMR, CRR            Date

19

20

21

22

23

24

25