IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

Robert Moss, individually and as general )
guardian of his minor child; Ellen Tillett, )          C.A. No.  7:09-1586-HMH
individually and as a general guardian of )
her minor child; The Freedom From )
Religion Foundation, Inc.; Melissa Moss, )          **OPINION AND ORDER**
 )
                    Plaintiffs, )
 )
        vs. )
 )
Spartanburg County School District No. 7, )
a South Carolina body politic and )
corporate, )
 )
                    Defendant. )

        In this declaratory judgment action, Plaintiffs challenge the constitutionality of a public

school's policy of conferring academic credit to high school students for off-campus religious

instruction.  Plaintiffs contend that such a policy, as adopted and implemented by Spartanburg

County School District No. 7 (the "School District"), is repugnant to the Establishment Clause

of the First Amendment.  In addition to declaratory relief, Plaintiffs seek nominal damages and

attorney fees.  This matter is presently before the court on the parties' cross-motions for

summary judgment.  The Attorney General of South Carolina, appearing as amicus curiae, has

filed a brief in support of the School District.  The court held a hearing on the merits of the

parties' pending motions on February 9, 2011, and for the reasons explained below, the court

grants the School District's motion for summary judgment and denies the Plaintiffs' motion for

summary judgment.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Since 1992, students enrolled in South Carolina public schools have had the opportunity to receive religious instruction by voluntarily attending released time classes,[1] and it is estimated that approximately 12,000 South Carolina students presently attend a released time class each week. (Def. Mem. Supp. Mot. Summ. J. Ex. B-1 (*Charlotte Observer* Article).) In 2002, the General Assembly of South Carolina formally codified school districts' authority to release students during the school day to partake in off-campus religious instruction. S.C. Code Ann. § 59-1-460(A). Four years later, the general assembly enacted into law the South Carolina Released Time Credit Act ("SCRTCA"), which authorized South Carolina public school districts to award high school students "elective Carnegie unit credits"[2] for released time religious instruction. S.C. Code Ann. § 59-39-112(A). The South Carolina legislature enacted the SCRTCA after finding that "the absence of an ability to award such credits ha[d] essentially eliminated the school districts' ability to accommodate parents' and students' desires to participate in released time programs." 2006 S.C. Acts 322. The statute directs school districts to apply "purely secular" criteria when awarding academic credit for released time instruction. § 59-39-112(A)(1).

Prior to the adoption of the SCRTCA, the School District permitted its students to receive released time religious instruction through Spartanburg County Bible Education in

---

[1] The term "released time" refers to the arrangement by which students enrolled in public schools are permitted to receive religious instruction during the school day and off of school property. Released Time History, http://www.rtce.org/pages.asp?pageid=32778.

[2] South Carolina uses a "Carnegie unit" to measure the volume of credits a student must acquire to qualify for a high school diploma. To graduate, a student must accumulate 24 Carnegie units of credit. 43 S.C. Regs. 234.

School Time ("SCBEST"), a non-profit religious education provider.  (Pl. Mem. Supp. Mot. Summ. J. Ex. 5 (Martin Dep. at 22).)  With student interest dwindling, however, SCBEST stopped offering religious instruction to students attending the School District sometime before 2006.  (Id.)  Following the enactment of the SCRTCA, SCBEST sought to institute a released time program that allowed Spartanburg High School students to receive academic credit for released time instruction.  In October 2006, SCBEST executed an agreement with Oakbrook Preparatory School ("Oakbrook"), an accredited interdenominational Christian school located in Spartanburg.[3]  (Pl. Mot. Supp. Mot. Summ. J. Ex. 8 (Seay Dep. at 20-21).)  Pursuant to the agreement, Oakbrook agreed to review and approve SCBEST's curriculum and provide oversight to the Christian instruction.  Because SCBEST is unaccredited, the agreement specified that Oakbrook would "acknowledge the participation and grade of each SCBEST student . . . and [would] transfer elective credit" to the School District at the conclusion of the course.  (Id. Ex. 11 (Dep. Ex. 7).)  After executing the agreement with Oakbrook, SCBEST sent numerous correspondences to the School District proposing the adoption of a new released time program that granted students academic credit consistent with the SCRTCA.  (Def. Mem. Supp. Mot. Summ. J. Ex. B-2 (Graves Dep. at Exs. 180, 182, 183).)

On January 4, 2007, the School District's Instructional Services Committee convened to determine whether to recommend the adoption of a new released time policy.  Drew Martin ("Martin"), the executive director of SCBEST, attended the meeting to present SCBEST's proposal for a policy allowing high school students to receive elective credit for an SCBEST released time course.  (Pl. Mem. Supp. Mot. Summ. J. Ex. 5 (Martin Dep. at 29).)  On January 9,

---

[3] The School District was not a party to this agreement.

2007, a member of the Instructional Services Committee presented a motion to the School District's Board of Trustees to offer high school students academic credit for released time instruction. The Board of Trustees unanimously adopted the motion and instructed that the School District would adopt a formal released time policy. (Def. Mem. Supp. Mot. Summ. J. Ex. B-2 (Graves Dep. at Ex. 151).)

After the January Board of Trustees meeting, the School District drafted an initial released time policy. SCBEST suggested that the School District develop a released time policy based upon the SCRTCA, and to aid the School District in crafting a policy, SCBEST provided school officials with a sample released time policy. (Pl. Mem. Supp. Mot. Summ. J. Ex. 19 (Tobin Dep. at 23, 27).) The School District did not adopt SCBEST's proposed policy; instead, its policy was influenced by the SCRTCA as well as a model policy provided by the South Carolina School Board Association in August 2006. (Def. Mem. Supp. Mot. Summ. J. at 5.) The proposed released time policy was read at the School District's February Board of Trustees meeting. The initial policy provided that the School District "may award high school students no more than two elective Carnegie unit credits for classes in religious instruction taken during the school day in accordance with this policy." (Pl. Mem. Supp. Mot. Summ. J. Ex. 34 (Dep. Ex. 155).) After making some minor amendments to its initial policy, the School District's released time policy was formally adopted by the Board of Trustees on March 6, 2007. Among the School District's changes to the policy was to amend the language providing that the School District "may award" academic credit to state that the School District "will accept" no more than two Carnegie unit credits for released time education. According to Nan McDaniel, the School District's Director of Secondary Education, the textual alteration was intended to clarify that the

4

School District was merely accepting transfer credits rather than actively "making judgments about the quality of the course."  (Def. Mem. Supp. Summ. J. Ex. B-12 (McDaniel Dep. at 10).)

The School District's adopted released time policy states:

**RELEASED TIME FOR RELIGIOUS INSTRUCTION**. *Code* JHCB

*Issued* 3/07.

Purpose: To establish the basic structure for released time for students for religious instruction.

The board will release students in grades seven through twelve from school, at the written request of their parent/legal guardian, for the purpose of religious instruction for a portion of the day.  The school will consider this part of the school day.

The Board will not allow the student to miss required instructional time for the purpose of religious instruction. Any absences for this purpose must be during a student's non-instructional or elective periods of the school day. When approving the release of students for religious instruction, the board assumes no responsibility for the program or liability for the students involved.  Its attitude will be one of cooperation with the various sponsoring groups of the school district.

The sponsoring group or the student's parent/legal guardian is completely responsible for transportation to and from the place of instruction.  The district assumes no responsibility or liability for such transportation. Religious instruction must take place away from school property and at a regularly designated location.

District officials will insure that no public funds will be expended to support a released time program and that district staff and faculty will not promote or discourage participation by district students in a released time program.

**Elective credit**

The district will accept no more than two elective Carnegie unit credits for religious instruction taken during the school day in accordance with this policy.  The district will evaluate the classes on the basis of purely secular criteria prior to accepting credit.  The district will accept off campus transfer of credit for release time classes with prior approval.

5

Adopted 3/07

(Id. Ex. B-13 (Released Time Policy).)

Spartanburg High School began offering students religious instruction through SCBEST in August 2007. (Id. Ex. B-10 (Martin Dep. at 125).) Throughout the implementation of its released time policy, the School District has taken affirmative steps to distinguish released time instruction from its secular curriculum. The School District forbids SCBEST from providing religious instruction on school property; instead, the released time courses are conducted at a church adjacent to Spartanburg High School. (Pl. Mem. Supp. Summ. J. at 6.) The School District has never advertised the SCBEST course, and it does not include the course on student registration forms. (Def. Mem. Supp. Summ. J. Ex. B-16 (White Dep. at 16).) If a student expresses interest in the course, a Spartanburg High School guidance counselor attempts to accommodate the course into the student's schedule. (Id. Ex. B-24 (Wolfe Dep. at 54).) The SCBEST course is not listed in the School District's course catalogue, and credit for released time education is afforded the same treatment as any other transfer course from a private school. (Id. Ex. B-18 (Tobin Dep. at 71).) At the completion of the semester, SCBEST relays the students' grades to Oakbrook, and Oakbrook sends the grades on an official transcript to Spartanburg High School. (Id. Ex. B-24 (Wolfe Dep. at 18).)

The School District, however, has been unable to completely distinguish itself from SCBEST throughout the implementation of its released time policy. School officials have allowed SCBEST to maintain a registration table at Spartanburg High School's PTO open house. (Pl. Mem. Supp. Summ. J. Ex. 32 (Graves Dep. at 72).) On at least one occasion, an

6

SCBEST teacher visited a classroom at the School District's junior high school to promote released time instruction.  (Id. Ex. 5 (Martin Dep. at 113).)  The School District also invited an SCBEST teacher to a seminar that it offered to educate new teachers about the School District's disciplinary policies and effective classroom management skills.  (Id. Ex. 32 (Graves Dep. at 122).)  Further, the School District has, on one occasion, disciplined a student who misbehaved during a released time class.  (Id. Ex. 15 (White Dep. at 81).)  SCBEST and the School District subsequently agreed that the School District would administer discipline for major behavioral issues, but SCBEST should resist sending students to the School District's principals and should first remove the student from class and attempt to contact the student's parents.  (Id. Ex. 47 (Dep. Ex. 75).)

Melissa Moss is a non-Christian, and she attended Spartanburg High School from August 2006 to May 2010.  (Pl. Mem. Supp. Summ. J. Ex. 2 (Melissa Moss Aff. ¶ 2).)  She alleges that the adoption of the School District's released time program made her feel like an "outsider" at school and has caused her emotional distress.[4]  (Pl. Resp. Ex. 4 (Melissa Moss Dep. at 37).)  Robert Moss ("Dr. Moss") is the father of Melissa Moss.  In February 2007, Dr. Moss became aware of the School District's released time policy when he received a letter that SCBEST sent to the parents of all rising tenth, eleventh, and twelfth grade students attending Spartanburg High School.  (Pl. Mem. Supp. Mot. Summ. J. Ex. 29 (Dep. Ex. 157).)  SCBEST acquired the names and addresses of the students from the School District, and the letter erroneously conveyed to its recipients that in February 2007 the School District approved a

---

[4] Approximately 1,500 students are enrolled at Spartanburg High School.  On average, less than four students each semester have participated in SCBEST's course since the School District adopted its released time policy in August 2007.  (Def. Mem. Supp. Summ. J. at 10.)

policy granting students academic credit for completion of the SCBEST course.  (Id. at 13.)  The letter further stated that the released time course offered by SCBEST would "help students learn the basic tenets of the Christian worldview."  (Id. Ex. 29 (SCBEST Letter).)  Explaining the educational content of the course, the letter provided:  "The first semester will cover the Old and New Testaments and the basic doctrines of the Christian faith.  During the second semester students will learn how they ought to live as a result of what they have learned during the first semester."  (Id. Ex. 29 (SCBEST Letter).)  The School District's principal drafted a corrective letter; however, it was never sent.  (Def. Mem. Supp. Mot. Summ. J. Ex. B-2 (Graves Dep. at Ex. 159).)  Dr. Moss, offended by the content of the letter and its overtly Christian message, attended the School District's board meeting to object to the School District's adoption of a policy that granted academic credit for religious instruction.  (Pl. Mem. Supp. Mot. Summ. J. Ex. 1 (Robert Moss Aff. ¶ 3(d)).)  Dr. Moss also conveyed his concerns about the policy's constitutionality in a meeting with the chairperson of the School District's Board of Trustees.  (Id. Ex. 1 (Robert Moss Aff. ¶ 3(e)).)  The School District, however, took no action in response to Dr. Moss's objections.

On June 16, 2009, Plaintiffs commenced this action to challenge the School District's released time policy pursuant to 42 U.S.C. § 1983.  Collectively, Plaintiffs consist of an enrolled student, parents of enrolled students, and a non-profit educational charity seeking organizational standing.  Plaintiffs direct their constitutional challenge solely at the adoption and implementation of the School District's released time policy and do not challenge the constitutionality of the SCRTCA.  Aside from Dr. Moss and his daughter, named plaintiffs include Ellen Tillett ("Tillett") and The Freedom from Religion Foundation, Inc.  Tillett is the

8

mother of a student currently enrolled at Spartanburg High School.  (Id. Ex. 3 (Tillett Aff. ¶ 2).)

She maintains that by allowing religious instruction, the School District conveys a message of

"intolerance and narrow-mindedness" in an academic environment.  (Id. ¶ 3.)  She further

believes that the School District's policy harms students.  The Freedom from Religion

Foundation is a Wisconsin non-profit educational charity whose mission is to defend the

constitutional principle of separation of church and states.

## II. DISCUSSION OF THE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  In deciding whether a genuine issue of material fact exists, the evidence

of the non-moving party is to be believed and all justifiable inferences must be drawn in his

favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or

unnecessary will not be counted."  Id. at 248.  Further, a litigant "cannot create a genuine issue

of material fact through mere speculation or the building of one inference upon another."  Beale

v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).  "Where the record taken as a whole could not lead

a rational trier of fact to find for the non-moving party, disposition by summary judgment is

appropriate."  Monahan v. County of Chesterfield, 95 F.3d 1263, 1265 (4th Cir. 1996).  These

principles do not change when, as here, the litigants have filed cross-motions for summary

judgment.  Rather, the court must review "each motion separately on its own merits to determine

whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted).

During the court's hearing on the parties' cross-motions for summary judgment, the parties agreed that the record contained no genuine disputes of material fact and that the sole issues remaining for resolution were legal. (Hr'g Tr. at 2.) Plaintiffs contend that the School District's adoption and implementation of its released time policy cannot withstand constitutional scrutiny because (1) it lacks a predominately secular purpose; (2) its principal effect is to advance religion; and (3) it fosters excessive entanglement with religion. The School District argues that its released time policy is consistent with the Establishment Clause and that many of Plaintiffs' allegations of unconstitutional conduct are insufficient to subject the School District to liability under § 1983. As a threshold issue, the School District challenges Plaintiffs' standing to contest the constitutionality of its released time policy. Because the court's jurisdiction hinges upon whether Plaintiffs have standing, the court addresses the issue of standing first. Bishop v. Bartlett, 575 F.3d 419, 423 (4th Cir. 2009).

**B.  Standing**

Article III of the Constitution constrains federal courts to resolve only actual cases and controversies. U.S. Const., art. III, § 2, cl. 1. Because of this constitutional limitation, plaintiffs must demonstrate they have standing to adjudicate their claim in federal courts. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998). A litigant satisfies Article III standing by "show[ing] that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12 (2004). Only injuries that are "concrete and particularized" and "actual or imminent" suffice

10

to confer standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Consequently, an interest shared by the public at large such as an "abstract injury in nonobservance of the constitution" is insufficient to establish Article III standing. Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 223 n.13 (1974).

The burden to establish standing rests with the party invoking federal court jurisdiction, Long Term Care Partners, LLC v. United States, 516 F.3d 225, 231 (4th Cir. 2008), and whether a party has standing hinges upon the facts at the inception of litigation. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180 (2000) ("[W]e have an obligation to assure ourselves that [the plaintiff] had Article III standing at the outset of litigation."). The plaintiff's burden to demonstrate standing is congruent with the plaintiff's burden of proof at different stages in the litigation.[5] Stephens v. County of Albemarle, 524 F.3d 485, 491 (4th Cir. 2008). At the summary judgment stage, therefore, the plaintiff can no longer predicate standing on general factual allegations; rather, the plaintiff must furnish, "by affidavit or other evidence, specific facts, which for purposes of the summary judgment motion will be taken to be true." Lujan, 504 U.S. at 561 (internal quotation marks and citations omitted). The School District contends, as it did in its motion to dismiss, that Plaintiffs have suffered no injury as a consequence of the School District's allegedly unconstitutional released time policy, and therefore, they lack Article III standing. The court disagrees.

---

[5] The court denied the School District's standing challenge at the pleading stage, finding that Plaintiffs' factual allegations were sufficient to survive the School District's motion to dismiss. Moss v. Spartanburg County Sch. Dist. No. 7, 676 F. Supp. 2d 452, 455-58 (D.S.C. 2009).

In Establishment Clause cases, the injury in fact component of standing presents distinct analytical complexities.  See Cooper v. U.S. Postal Serv., 577 F.3d 479, 489-90 (2d Cir. 2009) (observing that "there is uncertainty concerning how to apply the injury in fact requirement in the Establishment Clause context" because the Supreme Court has yet to provide "reliable and handy principles of analysis").  Because Establishment Clause plaintiffs are typically driven by their "spiritual, value-laden beliefs" rather than a physical injury or pecuniary loss, ACLU v. Rabun County Chamber of Commerce, Inc., 698 F.2d 1098, 1102 (11th Cir. 1982), a concrete injury in fact is "particularly elusive."  Suhre v. Haywood County, 131 F.3d 1083, 1085 (4th Cir. 1997).  Courts, therefore, recognize that an intangible injury such as spiritual harm "may suffice to make an Establishment Clause claim justiciable."  Id. at 1086; see also Vasquez v. L.A. County, 487 F.3d 1246, 1252-53 (9th Cir. 2007); Sullivan v. Syracuse Hous. Auth., 962 F.2d 1101, 1108 (2d Cir. 1992).  This recognition, however, does not negate a plaintiff's obligation to show a personal and particularized injury as a condition to commencing an Establishment Clause attack in federal court.

In Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464 (1982), the seminal case assessing standing for Establishment Clause plaintiffs, the Supreme Court reaffirmed that plaintiffs challenging government conduct under the Establishment Clause must predicate Article III standing on a direct injury.  Id. at 485. There, the Secretary of Education conveyed a tract of surplus government property to Valley Forge Christian College, a religious academic institution.  Id. at 467-68.  Plaintiffs, a nonprofit organization known as Americans United for the Separation of Church and State, challenged the constitutionality of the conveyance under the Establishment Clause.  Id. at 469.  The named

plaintiffs resided in Maryland and Virginia, and their organizational headquarters were located

in Washington, D.C.  <u>Valley Forge</u>, 454 U.S. at 487.  The conveyed property was in

Pennsylvania, and the plaintiffs discovered the conveyance through a news release.  <u>Id.</u>  The

Court found that the named plaintiffs lacked a personal stake in the challenged conveyance and

therefore suffered no direct injury.  It explained that a mere "psychological consequence

presumably produced by observation of conduct with which one disagrees" is insufficient to

confer standing.  <u>Id.</u> at 485.  Instead, Establishment Clause plaintiffs, like all others, establish

standing to adjudicate their claim by demonstrating "personal injury suffered by them *as a*

*consequence* of the alleged constitutional error."  <u>Id.</u>  In so holding, the Court emphasized that it

was not retreating from its precedent that Establishment Clause plaintiffs could predicate

standing on an intangible injury such as spiritual or psychological harm.  <u>Id.</u> at 486-87 & n.22.

Rather, the Court's determination hinged on the fact that the plaintiffs alleged only an abstract

constitutional violation, and they failed to show they suffered any personal injury whatsoever.

<u>Id.</u>

        The School District maintains that Plaintiffs' alleged injuries are akin to the generalized,

abstract injury found insufficient to confer standing in <u>Valley Forge</u>, positing that "[t]here is no

real difference between the Mosses, Tillet and someone in Wisconsin who reads about a policy

she disagrees with in her newspaper and gets upset about it."  (Def. Resp. Pl. Mot. Summ. J. at

15.)  The School District's argument, however, trivializes the Plaintiffs' alleged injury and fails

to recognize fundamental distinctions between <u>Valley Forge</u> and the case at bar.  Comprised of

an enrolled student and parents of enrolled students, these Plaintiffs constitute a class of

individuals distinctly affected by the School District's adoption and implementation of its

released time policy. The Supreme Court has observed that parents and their children have a cognizable interest in receiving a public education that comports with the Establishment Clause. Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 224 n.9 (1963). Accordingly, the Fifth Circuit has recognized that "students and parents of students attending public schools . . . enjoy a cluster of rights vis-a-vis their schools, and thus are not merely concerned bystanders." Doe v. Sch. Bd. of Ouachita Parish, 274 F.3d 289, 292 (5th Cir. 2001). Unlike the plaintiffs in Valley Forge, Plaintiffs here possess a personal and direct stake in the pending controversy. Melissa Moss, for example, maintains that the School District's released time policy facilitated a pro-Christian environment that made her, as a non-Christian, feel marginalized and ostracized at school. (Pl. Resp. Ex. 4 (Melissa Moss Dep. at 23-24).)[6] Ellen Tillett, whose son is currently enrolled at Spartanburg High School, avers that the School District's conferral of academic credit for religious instruction impermissibly entangles religion with the essential functions of school and is personally offensive to her because academic credit impacts class rank at Spartanburg High School. (Id. Ex. 8 (Tillett Dep. at 16); Pl. Mem. Supp. Summ. J. Ex. 3 (Tillett Aff. ¶ 4).) Each of the Plaintiffs claims to have suffered emotional harm as a consequence of the School District's adoption and implementation of its released time policy. These intangible, spiritual injuries transcend a mere abstract knowledge of unconstitutional conduct; instead they are paradigmatic of the cognizable injuries that typically suffice to give Establishment Clause plaintiffs standing. As an enrolled student and parents of enrolled students, Plaintiffs have

---

[6] Despite Melissa Moss's graduation from Spartanburg High School during the pendency of this litigation, neither party raises mootness concerns to her continued status as a plaintiff. The court notes, however, that Moss's claim for declaratory relief is moot; however, her claim for nominal damages remains viable. See Mellen v. Bunting, 327 F.3d 355, 364-65 (4th Cir. 2003).

shown they have a vested "spiritual stake in First Amendment values sufficient to give standing" to contest the School District's released time policy.  Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 154 (1970).[7]

The court's conclusion that these Plaintiffs have standing finds strong support in the Supreme Court's Establishment Clause jurisprudence where standing was addressed in passing. In School District of Abington Township v. Schempp, 374 U.S. 203 (1963), for example, school children and their parents challenged the constitutionality of Biblical readings in public school. Despite the fact that participation in the Biblical readings was voluntary, the Court noted that the plaintiffs had standing because, as students, they were "directly affected by the laws and practices against which their complaints were directed."  Id. at 207, 224 n.9; see also Suhre, 131 F.3d at 1087 ("The Supreme Court identified the proximity of the plaintiffs to the conduct they challenged as a critical factual distinction between the school children in Schempp and the plaintiffs in Valley Forge.").  Significantly, the Supreme Court has also found that parents of children enrolled at a public school have standing to challenge a school's voluntary released time program under the Establishment Clause.  See Zorach v. Clauson, 343 U.S. 306, 309 & n.4 (1952) ("No problem of this Court's jurisdiction is posed in this case since . . . appellants here are parents of children currently attending schools subject to the released time program."); see also H.S. v. Huntington County Cmty. Sch. Corp., 616 F. Supp. 2d 863, 869-73 (N.D. Ind. 2009) (relying, in part, on Zorach to find that plaintiffs had standing to challenge a released time

_____

[7] Because the court concludes that the individual named plaintiffs have standing to challenge the School District's released time policy, the court need not address whether the FFRF possesses organizational standing.  See Watt v. Energy Action Educ. Found., 454 U.S. 151, 160 (1981).

program).  While the Supreme Court has continued to clarify and refine standing doctrine since

Schempp and Zorach, these cases bolster the court's conclusion that Plaintiffs have carried their

burden in establishing Article III standing.  Having resolved the antecedent issue of standing in

favor of Plaintiffs, the court next addresses the School District's contention that Plaintiffs'

allegations of unconstitutional conduct are insufficient to subject the School District to liability

under § 1983.

### C. § 1983 Liability

Local municipal bodies are subject to § 1983 liability only for constitutional deprivations

for which they are directly responsible.  City of St. Louis v. Praprotnik, 485 U.S. 112, 123

(1998).  As a local governing body, therefore, the School District can be sued under § 1983 only

for unconstitutional conduct that flows from the implementation or execution of "a policy

statement, ordinance, regulation, or decision officially adopted and promulgated by that body's

officers" as well as "deprivations visited pursuant to governmental custom even though such a

custom has not received formal approval through the body's official decisionmaking channels."

Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978) (internal quotation marks omitted).

A government entity may be liable for a single decision or constitutional violation when "the

decisionmaker . . . possess[es] final authority to establish municipal policy with respect to the

action ordered."  Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (internal quotation

marks omitted).  To hold the School District liable for Plaintiffs' Establishment Clause claim,

therefore, Plaintiffs' allegations of unconstitutional conduct must be tethered to an official

policy or custom that the School District or its policymakers "officially sanctioned or ordered."

Id.

16

Plaintiffs' contention that the conferral of academic credit for religious instruction has the principal effect of advancing religion is directed at the implementation of the released time policy promulgated by the School District, and therefore, the School District can be liable under § 1983 for this alleged constitutional violation.  Many of Plaintiffs' allegations of unconstitutional cooperation and aid between the School District and SCBEST, however, are unattributable to school officials or cannot be reasonably connected to an official School District policy or custom.  As evidence of improper cooperation between the School District and SCBEST, Plaintiffs rely upon (1) a letter penned by an SCBEST official to the chairman of the School District's Board of Trustees explaining how religious instruction improves the lives of children; (2) a draft released time policy SCBEST provided to the School District; (3) remarks made by a School District official at a Board of Trustees meeting publicly thanking SCBEST for the contribution it was making; and (4) the School District's policy of retaining forms for students to request released time instruction in the guidance counselor's office.  (Pl. Mem. Supp. Summ. J. at 22.)

The School District cannot be held legally responsible for unilateral acts taken by SCBEST representatives, and consequently, Plaintiffs' allegations of unconstitutional cooperation premised upon the actions of SCBEST employees fail to expose the School District to § 1983 liability.  See Kentucky v. Graham, 473 U.S. 159, 166 (1985) (explaining that "a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation") (internal quotation marks omitted).  Moreover, Plaintiffs have failed to show that the stray remarks of a school official who publicly thanked SCBEST representatives during a board meeting were officially ratified or ordered by an official with decisionmaking authority.

17

Given that this alleged violation is not directed at a policy or custom promulgated by the School District or any of its decisionmakers, the School District cannot be liable for the school official's isolated remarks.  The court finds, however, that Plaintiffs' allegation that the School District's retention of released time permission forms on school property infringes the Establishment Clause is an allegation for which the School District may potentially be liable.  John Wolfe, the Director of Guidance at Spartanburg High School, averred that the released time application forms are customarily kept in the School District's Guidance Office.  (Pl. Mem. Supp. Summ. J. Ex. 13 (Wolfe Dep. at 9).)  This alleged violation derives directly from the execution of Plaintiffs' released time policy, and as such, it is a potential violation for which the School District may be held liable under § 1983.

Plaintiffs also claim that the School District impermissibly provided improper aid to SCBEST.  As with their allegations of unconstitutional cooperation, Plaintiffs must identify some overt policy or custom mandating or authorizing the violations they complain of for the School District to be held liable under § 1983.  Plaintiffs claim that the School District provided improper aid to SCBEST by (1) allowing SCBEST to make presentations in classrooms; (2) providing SCBEST the names and addresses of its incoming students and not correcting SCBEST's erroneous letter; (3) permitting SCBEST to maintain a table at PTO open houses; and (4) enforcing discipline for students' misbehavior at SCBEST.  (Pl. Mem. Supp. Summ. J. at 21-22.)  Plaintiffs concede that the School District had no overt policy addressing classroom presentations or discipline for misbehavior during released time classes.  (Id. at 14.) Nevertheless, the School District may still be liable if the court can identify a custom or policymaker with the authority to officially approve of the conduct forming the basis of the

18

alleged violation.  Plaintiffs introduced evidence showing that School District officials were apprised of and did not object to SCBEST teachers performing promotional visits in classrooms on school property.  For example, Drew Martin, the Executive Director of SCBEST, stated during his deposition that school officials met and discussed SCBEST's promotional visits on school property, and according to Martin, the impression he received from meeting was that SCBEST could continue to perform promotional visits.  (Id. at 12; Ex. 5 (Martin Dep. at 115).) School officials' ratification of SCBEST's promotional visits is sufficient to potentially subject the School District to § 1983 liability.  Plaintiffs have also shown that school officials approved of SCBEST's presence at PTO open houses.  Rodney Graves, the principal of Spartanburg High School, averred that school officials approved SCBEST's request to maintain at table at PTO open houses.  (Id. Ex. 32 (Graves Dep. at 116).)  The court finds, therefore, that the School District may be liable under § 1983 for this alleged violation as well.

Plaintiffs, however, failed to show that two instances in which School District employees administered discipline for student misbehavior was sanctioned or ordered by a School District official with final authority or otherwise establish that the School District had adopted a custom of administering discipline for misbehavior during released time instruction.  Plaintiffs further failed to connect the giving of addresses or the School District's failure to correct SCBEST's erroneous February 2007 letter with any overt policy adopted by the School District or otherwise identify any decisionmaker who authorized such conduct.  Plaintiffs, therefore, did not carry their burden in establishing that the School District could be subject to § 1983 liability for these alleged violations.

Based on the foregoing, the court finds that the School District can be subject to § 1983 liability only for Plaintiffs' alleged violations pertaining to the retention of released time permission forms on school property, allowing SCBEST to maintain a table at PTO open houses, and allowing SCBEST to perform promotional visits in classrooms. After determining the allegations for which the School District may potentially be held liable under § 1983, the court addresses the merits of Plaintiffs' claims.[8]

### D. Merits of Constitutional Challenge

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend I.[9] Although the Establishment Clause may have originally been "intended to erect a wall of separation between Church and State," Everson, 330 at 16 (internal quotation marks omitted), the Supreme Court has long recognized that not all government entanglement with religion is unconstitutional. Indeed, Establishment Clause jurisprudence instructs that the First Amendment "does not compel the government to purge from the public sphere all that in any way partakes of the religious." Van Orden v. Perry, 545 U.S. 677, 699 (2005) (Breyer, J., concurring). Although certain "[i]nteraction between church and state is inevitable," Agostini v. Felton, 521 U.S. 203, 233 (1997), courts have "been particularly vigilant in monitoring compliance with the Establishment Clause" in the context of public education because schools infuse values and

---

[8] As set forth in Part D of this Order, none of Plaintiffs' allegations, even those that Plaintiffs have failed to connect to an official policy or custom, infringe the Establishment Clause.

[9] The Establishment Clause has been incorporated to apply to the states by the Fourteenth Amendment. Everson v. Bd. of Educ., 330 U.S. 1, 8 (1947).

ideas in the minds of impressionable children.  <u>Edwards v. Aguillard</u>, 482 U.S. 578, 583-84 (1987).

To ascertain whether the School District's released time program impinges the Establishment Clause, the court must examine both the purpose and effect of the challenged government conduct.  <u>Glassman v. Arlington County</u>, 628 F.3d 140, 146 (4th Cir. 2010).  While the Supreme Court has articulated various analytical approaches to determine whether government action infringes the Establishment Clause, the Fourth Circuit has adhered to the tripartite analytical framework enunciated in <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971).  <u>See</u> <u>Mellen</u>, 327 F.3d at 370.  Employing the <u>Lemon</u> test, the court must consider the School District's released time policy against the following criteria:  (1) the challenged government action must have a secular purpose; (2) its principal or primary effect must neither advance nor inhibit religion; and (3) it must not foster excessive government entanglement with religion.  <u>Lemon</u>, 403 at 612-13.  If the court finds that the released time program violates any of <u>Lemon</u>'s three prongs, it must invalidate the challenged government action as unconstitutional.  <u>Koenick v. Felton</u>, 190 F.3d 259, 265 (4th Cir. 1999).

Prior to its adoption of the <u>Lemon</u> framework, the Supreme Court has examined the constitutionality of released time programs in public schools on two occasions.  In <u>McCollum v. Board of Education</u>, 333 U.S. 203 (1948), the Court invalidated a public school's released time policy.  There, the school district's challenged policy permitted teachers, who were hired by a private religious organization, to provide religious instruction to students with parental consent.  <u>Id.</u> 207-08.  Although the school district did not hire the religious instructors, they were nevertheless subject to the approval and supervision of the school district's superintendent.  <u>Id.</u>

21

at 208.  Pursuant to the school district's policy, religious instruction was administered once each week.  Id. at 207-08.  The classes were held in the students' regular classrooms, and those students who did not partake in the released time education were required to leave the classroom and pursue the school's secular curriculum in an alternative room.  Id. at 209.  Striking down the school's released time policy, the Court stated that "public school buildings used for the dissemination of religious doctrines" coupled with the "close cooperation" between school officials and devout religious organizations in the promotion of religious education constituted an impermissible integration of church and state.  Id. at 209, 212.

Four years later, in Zorach v. Clauson, 343 U.S. 306 (1952), the Supreme Court assessed the constitutionality of a New York City public school released time policy.  There, the challenged policy allowed students to be released during the academic day to receive off-campus religion instruction.  Id. at 308.  Students who did not participate in the off-campus religious instruction remained at school and pursued their secular curriculum.  Id.  The religious organizations relayed weekly reports to the public school, noting the children who were released but did not report to the class.  Id.  Upholding the constitutionality of New York City's released time policy, the Supreme Court expressly observed that the absence of religious instruction in public school classrooms as a significant distinction between the released time policy struck down in McCollum and the one upheld in Zorach.  Id. at 315.  Unlike a policy that brings overtly religious exercise onto the property of a public school, one that merely "encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs" does not violate the Establishment Clause.  Zorach, 343 U.S. at 314.  The Establishment Clause, the Court observed, poses no obstacle to a school's desire to craft a

neutral policy that does nothing more than suspend secular education for those students "who want to repair to their religious sanctuary for worship or instruction." Id.

Despite the Supreme Court's subsequent adoption of the Lemon framework, the Fourth Circuit has reaffirmed McCollum and Zorach's primacy as controlling precedent. Smith v. Smith, 523 F.2d 121, 123 (4th Cir. 1975). The parties agree, however, that the specific constitutional question presented in this case–whether a public school's bestowal of academic credit for off-campus religious instruction infringes the Establishment Clause–has not been subjected to judicial review in the wake of McCollum and Zorach. It is, therefore, incumbent upon the court to determine whether the School District, through the adoption and implementation of its released time policy, has infringed the Establishment Clause.

### 1. Purpose

Under Lemon's first prong, government conduct must have a secular purpose to withstand constitutional scrutiny. The government's purpose is determined from the perspective of an "objective observer" who is knowledgeable of the history and implementation of the challenged government conduct. McCreary County v. ACLU, 545 U.S. 844, 862 (2005). Application of the secular purpose test requires the court to inquire "whether government's actual purpose is to endorse or disapprove of religion." Wallace v. Jaffree, 472 U.S. 38, 56 (1985) (internal quotation marks omitted). Governmental action infringes the Establishment Clause when it is motivated by religion in general or upon the "advancement of a particular religious belief." Edwards, 482 U.S. at 585. This prong poses a "fairly low hurdle" for the government and is satisfied by finding a "plausible secular purpose" attributed to the government action. Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc., 224 F.3d 283, 287

23

(4th Cir. 2000); see also Wallace, 472 U.S. at 74 (O'Connor, J., concurring) ("[I]nquiry into the purpose of the legislature . . . should be deferential and limited.").  The government's purpose, moreover, need not be "exclusively secular," Brown v. Gilmore, 258 F.3d 265, 276 (4th Cir. 2001), but the court will not accept a secular purpose that is an "apparent sham" or one that is secondary to a predominately religious purpose.  McCreary County, 545 U.S. at 865.[10]

The School District's stated purpose for adopting its released time policy is to accommodate parents' and students' desire to receive religious instruction.  (Def. Mem. Supp. Mot. Summ. J. at 19.)  It is undisputed that accommodation of religion constitutes a legitimate secular purpose, Brown, 258 F.3d at 276, and courts have generally accepted accommodation of religion as a plausible purpose for released time education.  Smith, 523 F.2d at 125; see also Lanner v. Wimmer, 662 F.2d 1349, 1357 (10th Cir. 1981).  Nevertheless, Plaintiffs suggest that

---

[10] Citing Wallace v. Jaffree, the Fourth Circuit has stated in cases preceding McCreary County that Lemon's first prong is violated only when the challenged governmental action is "entirely motivated by a purpose to advance religion."  See, e.g., Lambeth v. Bd. of Comm'rs of Davidson County, 407 F.3d 266, 270 (4th Cir. 2005); Mellon v. Bunting, 327 F.3d 355, 372 (4th Cir. 2003).  In McCreary County, however, the Supreme Court expressed manifest disapproval of according Wallace such a sweeping application, explaining that the government infringes the Establishment Clause by acting "with the ostensible and predominate purpose of advancing religion."  McCreary County, 545 U.S. at 860, 864-65. Since McCreary County, the Fourth Circuit has not reexamined the precise standard to determine whether an asserted government purpose contravenes Lemon's first prong. District courts within the Fourth Circuit, however, have continued to cite the "entirely motivated" standard as viable.  See, e.g., Gray v. Johnson, 436 F. Supp. 2d 795, 800 (W.D. Va. 2006); Summers v. Adams, C/A No. 3:08-2265-CMC, 2008 WL 5401537, at *12 (D.S.C. Dec. 23, 2008).  Other courts, however, have instructed that the correct inquiry following McCreary County focuses upon whether the predominate purpose underlying the challenged governmental action is secular.  See, e.g., ACLU v. DeWeese, 633 F.3d 424 (6th Cir. 2011) (denominating Lemon's first prong as the "predominate purpose test" in the wake of McCreary County); Trunk v. City of San Diego, 629 F.3d 1099, 1108 (9th Cir. 2011). However, because Plaintiffs have failed to show that the School District's predominate purpose was to advance religion, it follows that they cannot carry their burden under either the predominate purpose or exclusively motivated standards.

the School District's articulated purpose is disingenuous and claim that its actual purpose is to impermissibly endorse Christianity. (Pl. Mem. Supp. Summ. J. at 24-26.) Given the deference with which courts review the government's purpose underlying a challenged action, Plaintiffs shoulder a heavy burden in demonstrating that the School District harbored an impermissible religious motive. Indeed, the Supreme Court has found <u>Lemon</u>'s purpose prong fatal to the constitutionality of challenged governmental action only when "openly available data supported a common sense conclusion that a religious objective permeated the government's action." <u>McCreary County</u>, 545 U.S. at 863.

Presented with this formidable burden, Plaintiffs principally rely upon the evolution of the policy as indicia of the School District's predominately religious purpose. Specifically, Plaintiffs point to the School District's decision to amend the policy's language providing that it would "award" academic credit to state that it would "accept" credit for released time instruction. (Pl. Mem. Supp. Summ. J. at 30-31.) The uncontroverted effect of this textual alteration meant that the School District would award academic credit only for a course completed and transferred from an accredited school. (<u>Id.</u> at 30.) By requiring released time credits be transferred from an accredited school, Plaintiffs contend that the School District's policy effectively forecloses non-Christian students from receiving academic credit for religious instruction because five of the six accredited private high schools in Spartanburg County are Christian schools, and therefore, non-Christian students would be unable to obtain an accredited school to sponsor a released time class. (<u>Id.</u> at 30-31.) Based upon the alleged disparate impact the School District's policy would have on non-Christians, Plaintiffs surmise that the School District's decision to amend its policy to accept only transfer credits for religious instruction

25

signals that the School District's predominate purpose is to advance Christianity and disapprove of all non-Christian religions. (Id.) Alternatively, Plaintiffs further argue, in passing, that the School District's improper religious purpose is evidenced by direct aid to and close cooperation with SCBEST throughout the adoption and implementation of its released time policy. (Id. at 29-30.) None of Plaintiffs arguments, however, suffice to show that the School District's actual purpose is to advance Christianity or that its articulated purpose is a sham.

The openly available data and facts accompanying the adoption and implementation of the School District's released time policy fail to establish that the School District harbored an impermissible religious motive. The text of the policy, cast in neutral terms, evidences no facial intent on the part of the School District to favor religion in general or a particular religious sect. According to Nan McDaniel, the School District's Director of Secondary Education, the decision to accept only transfer credits from accredited schools was to remove the School District from "making judgments about the quality of the course." (Def. Mem. Supp. Summ. J. Ex. B-12 (McDaniel Dep. at 10).) The School District's explanation for amending its policy is plausible. South Carolina law requires public school officials to assess a student's former work when a student seeks to transfer credit from an unaccredited school while credits from an accredited school are accepted by public schools at face value. Compare 43 S.C. Reg. 273(2) ("Units earned by a student in an accredited high school of this state or in a school of another state . . . will be accepted under the same value which would apply to students in the school to which they transferred."), with 43 S.C. Regs. 273(3) ("If a student transfers from a school, which is not accredited, he or she shall be given tests to evaluate prior academic work and/or be given a tentative assignment in classes for a probationary period."). By restricting conferral of

academic credit to religious instruction transferred from an accredited school, the School

District took affirmative steps to disentangle itself from pervasive oversight and monitoring of

the quality and rigor of religious instruction.  Plaintiffs have failed to proffer any objective,

external evidence that could reasonably support their contention that the School District's stated

purpose underlying the adoption of its released time program was disingenuous.  Instead, they

effectively ask the court to delve into the "veiled psyche of government officers" in an effort to

uncover some improper religious motive.  McCreary County, 545 U.S. at 863.  The Supreme

Court, however, has emphasized that Lemon's purpose prong does not contemplate such an

inquiry.  Viewing the School District's released time policy and its evolution through the lens of

an objective observer, familiar with its history and implementation, the court can ascertain no

secret religious motive on the part of the School District.  The School District's stated purpose

for its released time program, the accommodation of religion, is plausible and therefore must be

accepted.  Plaintiffs have failed to show that the School District harbored an impermissible

religious motive.

### 2.  Effect

Lemon's second prong asks whether the challenged governmental act has the primary

effect of advancing religion.  As with the purpose prong, the principal effect must be viewed

from the standpoint of an objective observer, Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290,

308 (2000), and governmental action is unconstitutional if its primary effect is to promote

religion in general or a particular religious sect.  Barghout v. Bureau of Kosher Meat & Food

Control, 66 F.3d 1337, 1345 (4th Cir. 1995).  When inquiring into the effect of the challenged

conduct, the government's asserted purpose or intent is irrelevant; rather, the court must

27

examine "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval of religion." Lambeth, 407 F.3d at 272. Government conduct or influence evidencing an "impermissible government advancement of religion includes sponsorship, financial support, and active involvement of the sovereign in religious activity." Madison v. Riter, 355 F.3d 310, 318 (4th Cir. 2003) (internal quotation marks omitted).

Plaintiffs maintain that the primary effect of the School District's released time policy is to promote religion. (Pl. Mem. Supp. Summ. J. at 26-29.) In support of their contention, Plaintiffs advance two principal avenues through which the School District has conveyed its message of endorsement. First, Plaintiffs cite numerous circumstances they contend demonstrate that the School District impermissibly provided direct aid to and engaged in close cooperation with SCBEST throughout the adoption and implementation of its released time policy. (Id. at 26-27.) Second, Plaintiffs maintain that a public school's bestowal of academic credit for religious instruction has the primary effect of endorsing religion. (Id. at 28-29.)

The court's inquiry into whether the School District's released time policy has the principal effect of promoting religion is framed by Zorach and McCollum, which define the contours of constitutionally permissible released time education in public schools. Plaintiffs, as they must, attempt to distinguish the School District's released time policy from the one upheld in Zorach, contending that the School District's cooperation with and aid to SCBEST exceeds the authority of a public school to accommodate religion under the Establishment Clause. Additionally, Plaintiffs posit that the conferral of academic credit has an impermissible effect of advancing religion.

28

As an initial matter, the court notes that the School District's released time policy is facially neutral, favoring no particular religion or denomination. Further, the policy's plain language and the School District's implementation of the released time policy evidence an intent to passively accommodate religion and to insulate itself from pervasive monitoring and oversight of the overtly religious instruction. The policy, for example, expressly forecloses the expenditure of public school funds for religious instruction, and School District employees are precluded from promoting or discouraging student participation in released time classes. (Def. Mem. Supp. Summ. J. Ex. B-13 (Released Time Policy); Ex. B-16 (White Dep. at 93-94).) There is no evidence in the record that the School District turned over its classrooms for religious instruction. The course is not listed in the Spartanburg High School course catalogue nor is it reflected on students' report cards. The School District passively allows its students who have obtained permission from their parents to partake in the off-campus religious instruction. Despite the policy's neutrality and the School District's efforts to segregate its secular curriculum from off-campus religious instruction, Plaintiffs contend that cooperation and aid evidence an impermissible sponsorship of religion that impinges Lemon's second prong.

Plaintiffs contend that the School District closely cooperated with SCBEST throughout the adoption of its released time policy, and that this cooperation has the primary effect of advancing religion. At the outset, the court notes that not all cooperation between a public school and a religious education provider rises to the constitutional magnitude. Indeed, Zorach illustrates that public school officials may passively cooperate with religious organizations in the development and implementation of a released time policy. See Zorach, 343 U.S. at 313-14 ("When the state encourages religious instruction or cooperates with religious authorities by

29

adjusting the schedule of public events to sectarian needs, it follows the best of our traditions."). Plaintiffs nevertheless contend that the cooperation between SCBEST and the School District exceeds the cooperation permissible under the Establishment Clause. Plaintiffs argue that a series of meetings between public school officials and SCBEST representatives throughout the adoption of the School District's released time policy coupled with the presence of released time permission forms on school property has the primary effect of advancing religion. (Pl. Mem. Supp. Summ. J. at 26-27.) The court disagrees.

Plaintiffs' allegations of impermissible cooperation between the School District and SCBEST are markedly distinguishable from the close cooperation between a religious education provider and the Illinois public school that the Supreme Court found unconstitutional in McCollum. Unlike McCollum, where the Illinois school district cooperated with a religious education provider by monitoring the selection of religious instructors and permitting the released time classes to be taught on school property, the cooperation between the School District and SCBEST is significantly more passive. McCollum, 333 U.S. at 207-09. Cooperation in the form of isolated collaboration between public school officials and a religious education provider and the retention of released time permission forms on school property, without more, does not impinge the Establishment Clause. To read the Establishment Clause as barring public school officials from working with religious education providers in the development and implementation of a released time policy would stifle public schools' ability to craft a released time policy that merely accommodates parents' and students' desire to partake in religious instruction consistent with Zorach. None of Plaintiffs' allegations of cooperation between SCBEST and the School District rise to the systemic and intricate relationship formed

30

between a public school and religion found unconstitutional in <u>McCollum</u>.  Based on the foregoing, Plaintiffs have failed to show that the School District's cooperation with SCBEST was anything more than a passive response to the development of a neutral released time policy that comports with the First Amendment.

Plaintiffs maintain that throughout the implementation of the released time policy, the School District provided aid to SCBEST the effect of which is to convey an impression of endorsement of religion.  (Pl. Mem. Supp. Summ. J. at 26-27.)  Like Plaintiffs' allegations of impermissible cooperation, none of their concerns rise to the pervasive oversight or sponsorship of religion the Supreme Court found constitutionally invalid in <u>McCollum</u>.  Plaintiffs contend that permitting SCBEST to perform promotional visits and allowing SCBEST to maintain a table at PTO open houses has the primary effect of advancing religion.  (<u>Id.</u>)  In <u>McCollum</u>, bringing religious instruction into the classrooms of a public school coupled with school officials retaining discretionary authority over the religious instruction proved fatal to the constitutionality of the challenged Illinois released time policy.  333 U.S. at 212.  Such an intricate relationship between religion and public education, the Court reasoned, amounts to impermissible "invaluable aid" that has the principal effect of advancing religion "through the use of the state's compulsory public school machinery."  <u>Id.</u>  Unlike the challenged policy in <u>McCollum</u>, where the "force of the public school was used to promote [religious] instruction," the record is replete with instances in which the School District conscientiously sought to insulate itself from religion and distinguish its secular curriculum from released time religious courses.  <u>Zorach</u>, 343 U.S. at 314.

The School District has precluded SCBEST from providing religious instruction on school property.  (Def. Mem. Supp. Summ. J. at 17-18.)  The School District, moreover, does not list SCBEST's course in the School District's course catalogue or otherwise advertise the course to students, and it instructs its counselors not to discuss the released time religious instruction with students unless the student expresses an interest in the class and proffers parental permission.  (Id.)  While the School District has allowed SCBEST to maintain a table at its PTO open house and conduct some on-campus presentations, (Pl. Mem. Supp. Summ. J. at 27), this alleged aid is not tantamount to the "invaluable aid" provided to a religious group that the Supreme Court found to infringe the Establishment Clause in McCollum.  333 U.S. at 212.  Any aid the School District provided to SCBEST by allowing it to maintain a table at PTO open houses is identical to the aid it afforded other outside organizations such as military recruiters, the Boys and Girls Club, fund-raising organizations, and various non-profit groups at the open houses.  (Pl. Mem. Supp. Summ. J. Ex. 32 (Graves Dep. at 72); Def. Resp. Opp'n Pl. Mot. Summ. J. Ex. G-6 (White Dep. at 92).)  Because the record shows that the School District treated SCBEST merely the same as other outside organizations in allowing it to maintain a table at PTO open houses, the court finds that Plaintiffs have failed to show that the School District's practice has the principal effect of endorsing religion.  Zorach clearly illustrates that the Establishment Clause is not offended when a public school encourages students to engage in religious instruction by passively cooperating with religious education providers and accommodating students' desire to receive religious instruction.  343 U.S. at 314.  Throughout the adoption and implementation of the released time policy, the School District has taken affirmative measures to insulate the secular functions of the school from religion.  Plaintiffs'

allegations of unconstitutional conduct, viewed from the perspective of an objective observer, fail to demonstrate a primary effect to advance religion.

Finally, Plaintiffs argue that by vesting religious organizations with unfettered power to issue academic credit, the principal effect of the School District's released time policy is to advance religion.  In support of their contention, Plaintiffs analogize the School District's released time policy to a Massachusetts statute the Supreme Court invalidated in Larkin v. Grendel's Den, Inc., after determining that the statute's primary effect was to advance religion.  459 U.S. 116, 125-26 (1982).  There, the challenged statute empowered churches with the authority to veto liquor licenses for establishments within 500 feet of a church.  Id. at 118.  The statute failed to articulate secular criteria to guide churches in executing their licensing authority or otherwise ensure that the churches' power was used in a religiously neutral manner.  Id. at 125.  Finding that the statute's principal effect was to promote religion, the Court explained that "the mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred."  Id. at 125-26.

Plaintiffs maintain that the School District's policy of allowing religious organizations to award academic credit for released time education equates to the same standardless delegation of governmental power to a religious body that was unable to withstand constitutional scrutiny in Larkin.  (Pl. Mem. Supp. Summ. J. at 28-29.)  By withdrawing itself from the grading process, Plaintiffs argue, the School District's released time policy constitutes a wholesale delegation of discretionary governmental authority and fails to incorporate any safeguards to ensure that the power is exercised according to secular principles.  (Id.)  Plaintiffs' argument, however, is

unavailing.  Unlike the power conferred upon churches in <u>Larkin</u>, the authority to issue academic credit recognized by the state is not a quintessential governmental function. Conversely, accredited private schools routinely confer academic credit for instruction its students receive, and public schools in South Carolina are obliged to accept the credit for transfer students regardless of the content of the course.  (Def. Mem. Supp. Summ. J. Ex. B-16 (White Dep. at 101-02).)  The School District's policy, therefore, is unremarkable in its effect of honoring academic credit received from an accredited private school.  The released time policy is also distinguishable from the Massachusetts statute invalidated in <u>Larkin</u> insofar that the power vested with religious officials under the policy is significantly more curtailed than the power churches exercised in <u>Larkin</u>.  The only students who are directly impacted by the released time policy are students who voluntarily desire to receive the religious education.  The School District, moreover, precludes students from receiving advanced placement credit for religious instruction; instead, released time classes are assigned the lowest possible weight under the South Carolina Uniform Grading Policy.  (Def. Resp. Pl. Mot. Summ. J. at 26.)

Based on the foregoing, the court finds that Plaintiffs' allegations fail to establish that the adoption and implementation of the School District's released time policy has the principal effect of advancing religion.  Viewed from the perspective of an objective observer, the School District's policy does no more than merely accommodate students' desire to partake in religious instruction.  The School District, therefore, has remained faithful to the Establishment Clause throughout the adoption and implementation of its released time policy.

### 3. Entanglement

Under the third phase of the <u>Lemon</u> framework, the court must assess whether the challenged government conduct fosters excessive government entanglement with religion. Not all government entanglement with religion is unconstitutional. <u>Agostini</u>, 521 U.S. at 233. To determine whether government entanglement is unconstitutionally excessive, the court must consider "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." <u>Lemon</u>, 403 U.S. at 615.

Plaintiffs contend that the constitutionality of the School District's released time policy is most vulnerable when scrutinized under <u>Lemon</u>'s entanglement prong. (Hr'g Tr. at 10.) As with the effect prong, Plaintiffs rely on <u>Larkin</u> in their attempt to show that the School District's released time policy fosters excessive entanglement with religion. There, the Supreme Court found that the Massachusetts statute violated <u>Lemon</u>'s entanglement prong in addition to the effect prong. In reaching its conclusion, the Court recognized that unconstitutional government entanglement with religion occurs not only when the government enters the realm of religion, but also when discretionary governmental functions are delegated to religious entities. <u>Id.</u> at 126. Under the Establishment Clause, the Court emphasized, the government is precluded from "substitut[ing] the unilateral and absolute power of a church for the reasoned decisionmaking of a public legislative body acting on evidence and guided by standards on issues with significant economic and political implications." <u>Id.</u> at 127. By accepting academic credit for religious instruction, Plaintiffs contend that the School District has impermissibly entangled religion with the affairs of the School District by delegating an exclusive governmental power to religious

education providers.  (Pl. Mem. Supp. Summ. J. at 32.)

       Plaintiffs' analogy of the School District's conferral of power to the Massachusetts statute invalidated in <u>Larkin</u> is premised upon its contention that awarding a high school grade is a discretionary governmental function.  (<u>Id.</u>)  As explained above, however, the power to issue an academic grade is not a power reserved exclusively to governmental bodies.  Unlike the sweeping and unrestrained governmental power the state of Massachusetts delegated to churches in <u>Larkin</u>, the School District's policy of accepting academic credit from an accredited private school does not foster excessive entanglement with religion.  As the Tenth Circuit has recognized, "[i]f  school officials desire to recognize released-time classes generally as satisfying some elective hours, they are at liberty to do so if their policy is neutrally stated and administered."  <u>Lanner v. Wimmer</u>, 662 F.2d 1349, 1361 (10th Cir. 1981).  By limiting the acceptance of academic credit from accredited schools, the School District's released time policy was designed to disentangle the School District from reviewing the religious content of released time instruction.  <u>See</u> <u>supra</u> p. 22.  The policy is cast in neutral terms and allows its students to petition for released time religious instruction regardless of the specific religion or denomination.  Plaintiffs' have failed to show how the School District's passive acceptance of academic credit for religious instruction constitutes excessive entanglement with religion.

       Plaintiffs have been unable to substantively distinguish the School District's released time policy from the New York City policy upheld in <u>Zorach</u>.  None of their allegations, considered alone or aggregated, remove the challenged policy from the ambit of <u>Zorach</u>.  The School District's released time policy is a passive measure on behalf of public school officials to accommodate the desire of its students to receive religious instruction.  Such a policy comports

with the Establishment Clause of the First Amendment.

It is therefore

**ORDERED** that the School District's motion for summary judgment, docket number 72, is granted.  It is further

**ORDERED** that Plaintiffs' motion for summary judgment, docket number 71, is denied. It is further

**ORDERED** that the School District's motions to strike, docket numbers 81, 82, and 83, are denied as moot.

**IT IS SO ORDERED.**


s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
April 5, 2011